UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CIVIL CASE NO. 3:09cv51

ELRICO DARNELL FOWLER,          )
                                )
        Petitioner,             )
                                )
v.                              )                    ORDER
                                )
GERALD BRANKER, Warden,         )
Central Prison                  )
Raleigh, North Carolina,        )
                                )
        Respondent.             )
_____ )

**THIS MATTER** is before the Court upon Elrico Darnell Fowler's Petition for Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Also before the Court is

Respondent's Motion for Summary Judgment. (ECF No. 14.) For the reasons that follow,

Fowler's Petition for Writ of Habeas Corpus (ECF No. 1) is **DENIED AND DISMISSED**, and

Respondent's Motion for Summary Judgment (ECF No. 14) is **GRANTED**.

FACTUAL AND PROCEDURAL HISTORY

Elrico Fowler was indicted on January 29, 1996, by a Mecklenburg County, North

Carolina, grand jury for the first-degree murder of Bobby Richmond. He also was indicted for

assault with a deadly weapon with intent to kill inflicting serious injury and two counts of

robbery with a dangerous weapon. See State v. Fowler, 548 S.E.2d 684, 689 (N.C. 2001).

The North Carolina Supreme Court summarized the State's evidence as follows:

On 31 December 1995 at approximately 10:45 p.m., Bobby Richmond

1

(Richmond), an employee at a Howard Johnson's Motel in Charlotte, North Carolina, entered the motel lobby looking for ice. Bharat Shah (Shah) was working as the motel night clerk. About five minutes later, two black males entered the motel and approached the check-in counter. One of the men pulled out a gun and ordered Richmond to get on the ground. The other man ordered Shah to "open the register and give [him] the money." While Shah was handing over the money, the man with the gun shot both Richmond and Shah. He then ordered Shah to open the office safe. When Shah stated he did not have the combination, the man shot Shah again. Both assailants then fled the motel.

The Charlotte-Mecklenburg Police arrived at the scene at 11:04 p.m. and found Richmond and Shah lying near the counter. Richmond was unresponsive. Shah was struggling to speak with police. He told the police they had been robbed by two black males, one wearing a green jacket.

When paramedics arrived, they found a large wound in the middle of Richmond's back. Richmond had no carotid pulse. The paramedics determined Shah's life was in danger. A hospital surgeon later found two wounds in Shah's left thigh, two more wounds in Shah's back, and a wound in Shah's right forearm.

A high-velocity weapon caused Shah's thigh injury. Doctors removed two .44-caliber bullet jacket fragments from his forearm during surgery. A .44-caliber bullet jacket was also found in Richmond's left lung. Police located a .44-caliber bullet core in the motel carpet beneath Richmond's chest wound. Police also found a .44-caliber bullet jacket and a large fragment from a .44-caliber bullet jacket at the scene. Both had been fired from the same weapon used to shoot Richmond. Other pieces of metal found at the scene were also consistent with .44-caliber ammunition.

Richmond had an entrance wound in his back and an exit wound in his chest. His chest was against a hard surface when he was shot. The evidence showed Richmond was likely shot from a distance of no more than three feet.

Officers found Richmond's wallet at the scene next to his body. The wallet contained no money. The cash register drawer and a plastic change drawer next to the register also contained no money. Approximately $300.00 was stolen from the motel during the robbery.

Jimmy Guzman (Guzman), the owner of a restaurant in the motel lobby, heard gunshots around 11:00 p.m. Guzman looked through the glass door of his restaurant and saw an individual standing behind the check-in counter, looking down.

Id. at 689-90.

2

Prior to trial, counsel moved to suppress any attempt by the State to have Guzman identify Fowler at trial as the man he saw behind the counter when Richmond was killed. Id. at 697. The trial court held a hearing on the motion during the October 13, 1997, Criminal Session of Superior Court, Mecklenburg County. (Mot. Hr'g Tr. 77-163, Oct. 13-17, 1997.)[1] After considering testimony from Guzman and Investigator Christopher Fish of the Charlotte Mecklenburg Police Department ("CMPD") and allowing Guzman to identify Fowler at the hearing, the court denied the motion. (Mot. Hr'g 77-163.)

At the same hearing, the court also considered the admissibility of Bharat Shah's statements to CMPD Sergeant Diego Anselmo and Investigator Fish. Fowler, 548 S.E.2d at 693. Shah, who had survived the shooting and moved back to India before the trial, refused to return to the United States to testify. Id. at 691. The court found that Shah was unavailable under North Carolina Rule of Evidence 804(a)(5), and that his statements to the two law enforcement officers were admissible pursuant to Rule 804(b)(5) and State v. Triplett, 340 S.E.2d 736 (N.C. 1986). Id. at 692-93.

Fowler was tried capitally at the October 27, 1997, Criminal Session of Superior Court, Mecklenburg County. Guzman testified that the man he saw behind the counter when Richmond was killed was black, in his late twenties, approximately six feet tall and wearing a green toboggan and a camouflage army jacket. Id. at 690. Guzman also described the man as having a pointed nose and hair on his face but not a full beard. Id. He identified Fowler as the man he

---

[1] Respondent manually filed the state record in this case. Initial citations to the state record will contain the name of the document, a pinpoint citation, and a date, if relevant. Thereafter, citations to the record will appear in short form.

3

saw behind the counter.  Id. at 697.

Sergeant Anselmo testified that he visited Shah at the hospital on January 1, 1996, at

approximately 4:00 p.m. and that Shah provided an account of the robbery and shootings.

Fowler, 548 S.E.2d at 690.  According to the North Carolina Supreme Court's evidentiary

summary, Shah told Anselmo that:

> Richmond entered the lobby looking for ice around 10:45 p.m.  Shah described
> the two men who entered the motel and robbed and shot him as black males
> around twenty-five or twenty-six years old, thinly built, and approximately 5'7"
> tall.  He said both individuals wore red ski caps with black stripes.  One man,
> wearing a gray and black flannel shirt, asked for a room.  The other man, wearing
> a red flannel shirt, removed a revolver from his waistband and ordered Richmond
> onto the ground.  The man with no gun ordered Shah to open the register and give
> him the money.  As Shah complied, the man in the red shirt shot Richmond and
> Shah.  The man with the gun ordered Shah to open the safe.  When Shah stated
> that he did not have the combination, the man shot Shah again.  Both individuals
> then fled.

Id.

Investigator Fish testified that he interviewed Shah on January 8, 1996, and that Shah

provided additional details about the robbery and shootings.  Id.  The North Carolina Supreme

Court summarized Shah's statement to Investigator Fish as follows:

> Shah stated he gave one of the men approximately $300.00 out of the register.
> The man to whom he handed the money was a black male with small eyes and a
> goatee, and was approximately the same height as Shah, about 5'4".  This man
> was wearing a black checked flannel shirt and dark toboggan.  Shah stated that the
> man at the end of the counter with the gun was also black and looked similar to
> his accomplice although he was a little taller.  This man had unshaven hair on his
> face but not a full beard.  The man was wearing a red checked flannel shirt and
> dark toboggan.  Shah thought the gun was black and about six inches long.  The
> man shot Richmond first and then shot Shah in the leg.  Investigator Fish showed
> photographs to Shah at the interview, and one of the photographs depicted
> defendant with a full beard.  Shah said during the interview that he did not get a
> good look at the shooter because he was primarily focused on the man taking the
> money.  Shah said he probably could not recognize the suspects.

4

Id. at 690-91.

Jermale Jones testified that around Thanksgiving, 1995, Fowler told him about a potential plot to rob a Howard Johnson's Motel.  (Tr. 392-94.)  Jones also testified that while they were incarcerated together at the Mecklenburg County Jail in 1996, Fowler told him that he went to the Howard Johnson's with the intention of robbing the place, but when the people working at the motel made Fowler ask twice for the money, he shot them.  (Tr. 395-96.)  Jones also testified that Fowler told him that a woman was coming in as he was leaving; he told her there was no vacancy and started laughing.  (Tr. 396.)  Fowler said the gun he used was "a big old .44."  (Tr. 397.)

On cross-examination, Jones acknowledged that after being housed with Fowler at the Mecklenburg County Jail, Jones was moved closer to Cullen Marshall, who told Jones that he was locked up for the same "thing" as Fowler.  (Tr. 406.)  Jones admitted that he spent more time talking with Marshall than he had with Fowler.  (Tr. 406.)  Jones also acknowledged that he contacted police seeking to exchange information about the Howard Johnson's murder for help with a pending armed robbery charge.  (Tr. 397.)

Edward Adams testified that he saw Fowler around 8:00 p.m. at a party on December 31, 1995, that Fowler left the party between 9:00 and 10:00 p.m. with two other men, and that before he left, Fowler stated that he needed some money to get into the Sugar Shack nightclub.  (Tr. 607-08.)  Adams testified further that Fowler and one of the men returned between midnight and 1:00 a.m., and that Fowler asked if anyone wanted to go to the Sugar Shack.  (Tr. 608-09.)  Subsequently, Fowler and some others left the apartment.  (Tr. 609.)

Adams also testified that the following night, January 1, 1996, he saw Fowler again at the

5

same apartment and that Fowler, working through intermediaries, sold him a .44 revolver. (Tr. 638-44.) Adams stated that he, in turn, gave the gun to "[a] guy by the name of Keyon" to "hold." (Tr. 650.) Adams testified that he was present when Keyon destroyed the gun the next day by taking it apart and throwing away the pieces. (Tr. 650-52.)

Finally, Adams testified that he and Fowler were incarcerated together at the Mecklenburg County Jail in April 1996. (Tr. 654.) According to Adams, Fowler asked what Adams had done with the gun Fowler had sold him, and when Adams said that it had been destroyed, Fowler responded, "I'm glad." (Tr. 660-63.) Adams also testified that Fowler told him that the district attorney thought someone other than Adams had purchased the gun. (Tr. 654, 660-63.)

On cross-examination, Adams acknowledged that he did not tell anyone in law enforcement about his conversations with Fowler until Sept. 29, 1997, despite having spoken with federal agents in June 1996 about other criminal matters. (Tr. 708.) Adams also acknowledged that he talked to the federal agents in 1996, because he wanted their help with pending state charges for possession of a stolen vehicle and armed robbery, and that his armed robbery charge was reduced to common law robbery in exchange for his testimony against his co-defendants. (Tr. 708, 711.) Adams volunteered that he ultimately did not testify against his co-defendants in the armed robbery trial because he was in the hospital with a gunshot wound when the trial started. (Tr. 711.) He admitted to having a number of prior drug charges that had been dismissed, to spitting on a Sheriff's deputy, and to communicating threats to the deputy by telling him that he was going to kill him. (Tr. 714-16.)

Leo McIntyre testified that he saw Fowler at the Sugar Shack on New Year's Eve, 1995,

6

and that Fowler was dressed in Army fatigues.  (Tr. 464, 467.)  Fowler told McIntyre that he had

just robbed the Howard Johnson's motel and had shot two employees.  (Tr. 465.)  Fowler stated

that he shot an employee at point blank range because he did not open the safe fast enough.  (Tr.

466.)  Fowler also told McIntyre that he only got $200.00 or $300.00 out of the cash register and

was now broke because he had paid for a few friends to enter the club.  (Tr. 466-67.)  McIntyre

also testified that he saw Fowler later in the week at a car wash and that he gave Fowler a ride.

(Tr. 467.)  During the ride, Fowler told McIntyre that he thought he had killed both Howard

Johnson's employees but had discovered that one of them had survived.  (Tr. 468.)  McIntyre

was married to Fowler's step-sister, Tsombique Roseboro.  (Tr. 463-64.)

McIntyre acknowledged that he did not tell anyone in law enforcement what he knew

about the Howard Johnson's crimes until June 1996, after he was indicted on federal drug

conspiracy charges.  (Tr. 475, 490.)  He testified that in exchange for his truthful testimony, the

State had agreed to inform the United States Attorney that McIntyre had testified in Fowler's

case.  (Tr. 469)  McIntyre admitted that he hoped to get his federal sentence reduced.  (Tr. 474.)

Waymon Fleming, Leo McIntyre's cousin, testified at trial that at the time of the Howard

Johnson's murder, he was living with Fowler and Fowler's other step-sister, Kizzy Roseboro.

(Tr. 756-57.)  Fleming testified that Fowler told him that he had robbed the Howard Johnson's

and shot the employee who would not open the safe.  (Tr. 760.)  Fleming also testified that the

last time he spoke to Fowler, he warned Fowler that the police had been to the house looking for

him in connection with the Howard Johnson's murder.  (Tr. 761-64.)  Fowler told Fleming his

plans to flee the city, and Fleming relayed that information to a contact with the Bureau of

Alcohol, Tobacco, Firearms, and Explosives.  (Tr. 764-65, 766-68.)

Fleming acknowledged that he had been indicted, along with McIntyre, on federal drug conspiracy charges in May 1996. (Tr. 790.) He testified that in exchange for his truthful testimony, the State had agreed to inform the United States Attorney of Fleming's testimony in Fowler's case. (Tr. 781, 783.) Like McIntyre, Fleming admitted that he hoped to get his federal sentence reduced. (Tr. 785.) Fleming also testified on cross-examination, however, that the reason he had agreed to testify against Fowler was because Fowler "took that gun . . . if he wouldn't have took the gun, I probably wouldn't be here today." (Tr. 815.)

Shenitra Johnson testified that she hosted a party that Fowler attended at the Westwood Apartments on New Year's Eve, 1995. (Tr. 948.) Johnson testified that Fowler arrived at the party at around 10:30 p.m. and that he did not leave again until around 1:15 or 1:30 a.m. when he went to the Sugar Shack Club with Cullen Marshall and Eric Moore. (Tr. 949-50.) She also testified that Fowler had either a .25 or .38 caliber hand gun that night and that the gun had a clip. (Tr. 951-52.)

Johnson testified further that Fowler and Marshall came to her apartment in the early evening of January 1, 1996. (Tr. 953.) She stated that the only other person there was her roommate, Nini, and that Fowler did not attempt to sell a gun that evening or at any other time at her apartment. (Tr. 953.) Johnson also testified that she did not know anyone named Edward Adams. (Tr. 951.)

In rebuttal, CMPD Officer James Sanders testified that he and Special Agent David Martinez of the Federal Bureau of Investigation interviewed Johnson on January 11, 1996. (Tr. 1039-40.) Sanders testified that Johnson told them that Cullen Marshall and Eric Lemans Moore arrived at her apartment at around 11:30 p.m. on New Year's Eve and that Fowler arrived shortly

8

thereafter with two women that she did not know. (Tr. 1040-41.) Johnson also told the two law enforcement officers that when he arrived, Fowler had in his possession a ".44 big gun, Clint Eastwood kind," which he sold to a man she knew variously as "Black," "Smokey," "Keyon," "KiKi Bird," and "Stick Up Kid." (Tr. 1041-42.)

The jury returned unanimous guilty verdicts on all charges. Fowler, 548 S.E.2d at 689. The jury specifically found Fowler guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. Id.

A capital sentencing hearing was held before the same jury. The State submitted three aggravating circumstances: (1) the defendant committed the murder to avoid or prevent a lawful arrest, see N.C. GEN. STAT. § 15A–2000(e)(4); (2) the defendant committed the murder while engaged in the commission of a robbery, see id. at § 15A–2000(e)(5); and (3) the defendant committed the murder as part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person, see id. at § 15A–2000(e)(11). Fowler, 548 S.E.2d at 703. Defense counsel called five witnesses in mitigation, including Fowler's mother, who gave testimony regarding Fowler's childhood, unstable home life, relationships with his parents, and young adulthood.

The jury unanimously found all three aggravating circumstances. Id. at 703. Of the thirteen mitigating circumstances submitted, one or more jurors found four mitigating circumstances: (1) defendant was twenty years old at the time of the murder; (2) defendant had no stable father figure in his life; (3) defendant had an unstable home environment; and (4) defendant's mother abused alcohol. Id. The jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that

9

recommendation. Id. at 689. The trial court also sentenced defendant to terms of imprisonment for his remaining convictions. Id.

On July 20, 2001, the North Carolina Supreme Court affirmed Fowler's convictions and sentences, concluding that imposition of the death penalty in this case was not disproportionate to the penalty imposed in similar cases. Id. at 704. On March 18, 2002, the United States Supreme Court denied Fowler's petition for writ of certiorari. Fowler v. North Carolina, 535 U.S. 939 (2002).

On November 13, 2002, Fowler filed a Motion for Appropriate Relief (hereinafter "MAR") in Mecklenburg County Superior Court, raising thirteen claims. He filed an amendment to the MAR (hereinafter "AMAR") on November 12, 2004, raising an additional five claims.

The Superior Court (hereinafter "MAR court") held non-evidentiary hearings on the MAR and AMAR on August 8, 2005, and December 19, 2005. By Order filed March 10, 2006, the court denied all of Fowler's claims except for four claims raised in the MAR and three claims raised in the AMAR. The court held an evidentiary hearing on those seven claims from July 31, 2006, to August 3, 2006; the court reopened the hearing on April 20, 2007, and again on April 26, 2007. On October 22, 2007, the court entered an order denying the seven remaining MAR and AMAR claims.

Fowler filed a petition for writ of certiorari seeking review of the MAR court's decisions, which the North Carolina Supreme Court denied. State v. Fowler, 668 S.E.2d 343 (2008). The United States Supreme Court likewise denied Fowler's subsequent certiorari petition. Fowler v. North Carolina, 129 S.Ct. 2392 (2009).

10

On February 12, 2009, Fowler filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, raising sixteen claims. (ECF No. 1.) Respondent filed a Response (ECF No. 13) and the instant Motion for Summary Judgment (ECF No. 14) on May 27, 2009. Fowler filed a Reply to the Response and Response to the Motion for Summary Judgment on August 14, 2009. (ECF No. 19.)

STANDARD OF REVIEW

Review of Fowler's claims that were adjudicated on their merits by the MAR court is limited by the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), as construed by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362, 374-91 (2000). This Court may grant habeas relief on claims of constitutional error adjudicated on their merits in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by th[e United States Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." <u>Williams</u>, 529 U.S. at 405; <u>Lewis v. Wheeler</u>, 609 F.3d 291, 300 (4th Cir. 2010) (quoting <u>Williams</u>, 529 U.S. at 405). A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case."

11

<u>Williams</u>, 529 U.S. at 407; <u>see also</u> <u>Ramdass v. Angelone</u>, 530 U.S. 156, 165-66 (2000) (plurality opinion) ("A state determination may be set aside under this standard if, under clearly established federal law, the state was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled.").

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law" for § 2254(d)(1) purposes. <u>Williams</u>, 529 U.S. at 410. The former requires a "substantially higher threshold" to obtain relief than does the later. <u>Schiro v. Landrigan</u>, 550 U.S. 465, 473 (2007). A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

A habeas court, therefore, must "determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." <u>Richter</u>, 131 S.Ct. at 786. A petitioner has the burden of establishing that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

<u>ANALYSIS</u>

<u>Guilt Phase</u>

<u>Guzman's In-Court Identification</u>

Fowler asserts that Guzman's in-court identification of him as the man he saw in the

12

lobby of the hotel when the murder and robbery took place was the product of impermissibly suggestive out-of-court identification procedures. (Habeas Pet. 16, ECF No. 1.) He claims that the trial court violated his right to due process when it refused to grant his motion to suppress Guzman's in-court identification. (Pet. 16, ECF No. 1.)

Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). "Misidentification is 'irreparable' when the source of the error is so elusive that it cannot be demonstrated to a jury, which therefore will give excessive weight to the eyewitness testimony." United States v. Williams, 522 F.3d 809, 811 (7th Cir. 2008) (citations omitted). "The Due Process Clause is not implicated, however, if the 'identification was sufficiently reliable to preclude the substantial likelihood of misidentification.'" United States v. Saunders, 501 F.3d 384, 389 (4th Cir. 2007) (quoting United States v. Johnson, 114 F.3d 435, 442 (4th Cir. 1997)); see also Manson v. Brathwaite, 432 U.S. 98, 106 (1977) (stating that the "central question" is "whether under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive") (internal quotations omitted).

To determine whether a challenged identification should be suppressed, the reviewing court must engage in a two-step process. United States v. Wilkerson, 84 F.3d 692, 695 (4th Cir. 1996). First, the defendant "must prove that the identification procedure was impermissibly suggestive." Holdren v. Legursky, 16 F.3d 57, 61 (4th Cir. 1994) (citing Brathwaite, 432 U.S. at 114). "A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime." Satcher v. Pruett, 126 F.3d 561,

13

566 (4th Cir. 1997) (citing <u>United States v. Peoples</u>, 748 F.2d 934, 935-36 (4th Cir. 1984)).

If the court finds that the identification process or procedure was not impermissibly suggestive, the inquiry ends.  <u>See</u> <u>United States v. Harris</u>, 636 F.3d 1023, 1026 (8th Cir. 2011) ("Only if the photographic lineup was impermissibly suggestive must we proceed to analyze, under the totality of the circumstances, whether the impermissibly suggestive lineup created a likelihood of misidentification violating due process.") (citation omitted); <u>Saunders</u>, 501 F.3d at 389 n.1 ("When the suggestiveness in the procedure does not reach the impermissible level, the 'potential for error' (or potential for misidentification) is left for testing 'by a course of cross-examination at trial.'") (quoting <u>Simmons</u>, 390 U.S. at 384)).  As explained by the Seventh Circuit,

> Unless the misidentification is irreparable, there is no basis for blocking the testimony.  Perceptual biases and errors are endemic to identification. . . . The normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence.

<u>Williams</u>, 522 F.3d at 811.

If the defendant meets his burden, however, the court then must assess whether "the identification was nevertheless reliable under the totality of the circumstances."  <u>Holdren</u>, 16 F.3d at 61.  A witness's out-of-court identification that is unreliable and, therefore, inadmissible on due process grounds, also renders an in-court identification inadmissible because a witness in that circumstance "'is apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of subsequent . . . courtroom identification.'" <u>Saunders</u>, 501 F.3d at 390 (quoting <u>Simmons</u>, 390 U.S. at 383-84; citing <u>United States v. Smith</u>, 459 F.3d 1276, 1293-94 (11th Cir. 2006); <u>Amador v. Quarterman</u>, 458 F.3d 397, 413 (5th Cir.

14

2006)).

Guzman was interviewed by police in the hours after the murder and described the person that he saw behind the counter at the Howard Johnson's as a black male in his late twenties, approximately six feet tall, and weighing 175-180 pounds. (Mot. Hr'g 91, 128.) The man was wearing a green toboggan and a camouflage army jacket. (Mot. Hr'g 91, 128.) Guzman also described the man as having a long face and nose and as being slightly unshaven. (Mot. Hr'g 128-29.) In the early hours of January 1, 1996, police took Guzman for a show-up along the side of a nearby road where they had detained a possible suspect, but Guzman was unable to positively identify the person as the man he saw in the hotel lobby.[2] (Mot. Hr'g 3-4, 143.)

On January 8, 1996, Anselmo showed Guzman six individual color photographs, one of which was of Fowler with a full beard, mustache, and full head of hair, taken in November 1995. (Mot. Hr'g 97, 113-14, 158.)[3] Guzman was unable to identify any of the men in the array as the one he had seen at the motel on New Year's Eve. (Mot. Hr'g 99-100, 103.)[4]

Fowler was arrested on January 12, 1996. (Mot. Hr'g 87.) A photograph taken at the time of his arrest was included in a one-page, computer-generated array of six black and white

_____

[2] Police later confirmed that this suspect was at work elsewhere when the crimes at the Howard Johnson's were committed. (Mot. Hr'g 6-7, 121, Oct. 13-17, 1997.)

[3] This set of photographs was identified as Defendant's Voir Dire Exhibit 13 at the suppression hearing.

[4] Guzman also was shown photographic lineups of two other men on January 8, 1996. (MAR Ex. 39, at 1.) Guzman did not identify anyone in those two lineups either. (MAR Ex. 39, at 1.) This evidence was not presented at the suppression hearing.

On January 11, 1996, Guzman was shown photographic lineups of Cullen Marshall and Vontez Ashford, Fowler's cousin. (MAR Ex. 39, at 1.) Guzman stated that Marshall's photo resembled one of the individuals at the Howard Johnson's but "could not say for sure." (MAR Ex. 39, at 1.) With respect to the Ashford lineup, Guzman stated that "#4 resembles one of the individuals except with darker skin." (MAR Ex. 39, at 1.) This evidence also was not presented to the trial court at the suppression hearing.

15

photographs shown to Guzman on January 14, 1996.[5]  (Mot. Hr'g 78-81, 84.)  In the photograph,

Fowler was bald, did not have a beard or mustache, but his face was slightly unshaven.  (Mot.

Hr'g 113-14.)  Investigator Fish told Guzman that a suspect may or may not be in the

photographs and that he wanted Guzman to look at each one carefully and tell him if anyone

looked familiar.  (Mot. Hr'g 84, 131-32.)  Guzman picked out Fowler's picture as the one most

closely resembling the man at the motel, stating that the facial structure was similar.  (Mot. Hr'g

85, 120, 133.)  He was unable to state for sure, however, that the picture was of the man he had

seen.  (Mot. Hr'g 85, 103.)  Investigator Fish had Guzman put his signature on the back of

Fowler's photograph in the array.  (Mot. Hr'g 85.)

On April 3, 1996, Investigator Fish showed Guzman another photo array.  Fowler's

photograph was not in the array, but the array did include a photograph of a man whom

investigators believed was Fowler's accomplice in another robbery.[6]  (Mot. Hr'g 104-06, 107,

115.)  Guzman pointed out two photos, saying that they most closely resembled the man he had

seen at the motel.  (Mot. Hr'g 107.)  Neither was of the suspected accomplice.  (Mot. Hr'g 108.)

---

[5] This photo array was identified as State's Voir Dire Exhibit 2 at the suppression hearing.

[6] According to Fowler, this array contained pictures of both Cullen Marshall and a man named Terry Springs.  (Pet. 22, ECF No. 1.)  Testimony at the suppression hearing regarding the array was confusing.  Investigator Fish testified that he had shown a witness, Page Long, six separate photo arrays on April 3, 1996, and that Page had selected photos of Marshall and Springs.  (Mot. Hr'g 103-06.)  One of the six arrays Fish showed Page was identified at the suppression hearing as Defendant's Voir Dire Ex. 15.  Defense counsel's questions, and Fish's answers, implied that both Marshall's and Springs's photos appeared in Defendant's Voir Dire Ex. 15.  (Mot. Hr'g 103-06.)  When counsel questioned Fish about the arrays shown to Guzman on the same date, however, Fish testified that Guzman was shown only the array containing the photo of Springs, implying that the photo of Marshall was in a different array.  (Mot. Hr'g 107-18.)  The matter was confused even further when Fish also stated that the array he showed Guzman was Defendant's Voir Dire Exhibit 15.  A supplemental report made by Fish on April 3, 1996, states, however, that he showed Guzman "a photo lineup of Terry Eugene Springs" and that Guzman "had been shown lineups earlier of the other suspects."  (MAR Ex. 39, at 1.)  As noted previously, Sergeant Anselmo had shown Guzman a lineup of Marshall on January 11, 1996.  See discussion supra note 4.  Taken collectively, the record indicates that Defendant's Voir Dire Ex. 15 contained a photograph of Springs but not Marshall.

16

Several days before the hearing on Fowler's motion to suppress Guzman's identification, Guzman met with prosecutors to discuss the upcoming proceedings. (Mot. Hr'g 144.) At that time, Guzman was given a subpoena to appear at the hearing. (Mot. Hr'g 144.) The subpoena named Fowler as the defendant in the case. (Mot. Hr'g 145.) Prosecutors told Guzman that during the hearing, Fowler would be seated between his attorneys at the defense table. (Mot. Hr'g 145.)

At the hearing, Guzman identified Fowler as the man he had seen in the motel lobby on New Year's Eve, 1995. (Mot. Hr'g 133-34.) Guzman stated that he was confident that Fowler was the man he had seen and that his identification was based upon seeing Fowler in the motel lobby, not on having seen Fowler's photograph at some point prior to the hearing. (Mot. Hr'g 134.) When shown the January 14, 1996, photo array at the hearing, Guzman was unable to identify which photo he had selected on that date. (Mot. Hr'g 135, 149-50, 161.)

At the conclusion of the hearing, the trial court made extensive findings of fact and concluded that the pre-trial identification procedures were not impermissibly suggestive and that Guzman's in-court identification was based upon his independent recollection of Fowler from the night of the crimes. (Mot. Hr'g 154-62.) On appeal, the North Carolina Supreme Court affirmed, finding sufficient evidence in the record to support the trial court's findings, and concluding that the out-of-court procedures used in this case were not impermissibly suggestive. Fowler, 548 S.E.2d at 698-99. The court also concluded that even if the identification procedures were impermissibly suggestive, they did not create a substantial likelihood of irreparable misidentification. Id. As explained below, this conclusion did not contradict the governing law established in Simmons, or any other principle of federal law clearly established

17

by the Supreme Court.  See § 2254(d)(1); see also Simmons, 390 U.S. at 384.

In analyzing whether the state court decision involved an unreasonable application of clearly established federal law, the Court must consider the specificity of the rule at issue.  See Harrington, 131 S.Ct. at 786 (citing Yarborough, 541 U.S. at 664).  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough, 541 U.S. at 664.  In Simmons, the Supreme Court spoke in general terms in holding that suppression of in-court identification testimony is not merited unless, based on the totality of the circumstances, the pre-trial identification presents a substantial likelihood of irreparable misidentification.  See Dunlap v. Burge, 583 F.3d 160, 166 (2d Cir. 2009) (citing Simmons, 390 U.S. at 384.)  This rule affords significant discretion to the state court.  See Simmons, 390 U.S. at 384 ("[E]ach case must be considered on its own facts.").

In the instant petition, Fowler does not allege that the compositions of the photo arrays were suggestive in any way other than that his was the only photo that appeared in more than one array.  (Pet. 26, ECF No. 1.)  He also does not allege that investigators did or said anything when showing the arrays to Guzman to suggest that he identify a particular photograph or that they did anything afterward to indicate to Guzman that he had picked out the photo of the person they suspected of having committed the crime.  (Pet. 26, ECF No. 1.)  Instead, Fowler's contention is that it was the cumulative effect of viewing successive photographic arrays and meeting with prosecutors that led Guzman to a positive identification at the hearing and subsequent trial. Fowler points out that:

> Guzman, who testified throughout that it was the face, particularly the nose, which was the basis for his identifications of Fowler, went from finding nothing similar about Fowler's photograph shown to him on 8 January, to finding

18

similarities when shown another photograph of Fowler on 14 January, six days later, making only a tentative and qualified identification which he also made of two other people shortly after that, to a confident identification of Fowler in court at the hearing on 14 October 1997, 22 months after the crime and four days after the prosecutors explained to him . . . precisely where [Fowler] would be located in court.

(Pet. 27, ECF No. 1.)  This argument, however, goes largely to the reliability of the identification, the second step of the analysis, not to the suggestiveness of the procedures.

The use of successive arrays that include a photograph of the defendant is not per se unduly suggestive.  See e.g., United States v. Martin, 391 F.3d 949, 952-53 (8th Cir. 2004) (holding that use of two photographic spreads sharing only a picture of the defendant  was not impermissibly suggestive) (citations omitted); United States v. Harris, 281 F.3d 667, 670 (7th Cir. 2002) ("[T]here is nothing per se impermissible about placing the same suspect in two different identification procedures.") (citation omitted).  In this case, the photos of Fowler were markedly different, as were the photo arrays themselves; Guzman was shown two lineups that did not contain Fowler's photo several days before he was shown the second array with Fowler's photo (MAR Ex. 39, at 1); and the photo of Fowler in the January 14, 1996, array was difficult to see (Mot. Hr'g 152.  The trial court found it significant that Guzman was unable to choose a photo of Fowler on January 8, 1996, when Fowler had a full head of hair, mustache, and beard, and that Guzman chose photographs of other men on April 3, 1996, when Fowler was not in the array.  (Mot. Hr'g 161-62.)  Moreover, when he choose the photo of Fowler on January 14, 1996, Guzman told investigators that Fowler's picture most closely resembled the man he had seen at the motel, which was the same thing he said about the two men in the April 3, 1996, lineups.  (Mot. Hr'g 85, 107, 120, 133.)  Finally, of particular significance to the trial court, after having

19

identified Fowler in court as the man he saw behind the counter at the Howard Johnson's, Guzman could not remember which photo he had chosen in the January 14, 1996, array. (Mot. Hr'g 161-62.) On this record, the Court cannot find that the state court applied <u>Simmons</u> unreasonably when it concluded that the pre-trial identification procedure involving the use of successive photo arrays was not impermissibly suggestive. <u>See</u> <u>Fowler</u>, 548 S.E.2d at 698.

As for the meeting with prosecutors and Guzman, the state supreme court observed that it appeared to be nothing more than an opportunity to go over what would happen at the suppression hearing and found that nothing in the record suggested that the prosecutors had encouraged Guzman to make a false identification. <u>Fowler</u>, 548 S.E.2d at 698. While admonishing that "prosecutors should avoid instructing [a] witness as to [a] defendant's location in the courtroom," the court also found that prosecutors did not provide Guzman with any information "that would not have been readily apparent to him during the proceeding." <u>Id.</u>

Prior knowledge of a defendant's name and location in a courtroom proceeding also is not per se impermissibly suggestive. <u>See</u> <u>e.g.</u>, <u>United States v. Murray</u>, 65 F.3d 1161, 1169 (4th Cir. 1995) (declining to adopt per se rule that giving a witness an opportunity to observe the defendant in court prior to testifying is unnecessarily suggestive and noting that the witness would have seen the defendant at the defense table immediately before testifying); <u>accord</u> <u>United States v. Gilchrist</u>, 119 F. App'x 485, 492 (4th Cir. 2005) (unpublished) (holding that allowing witness to view defendant at counsel's table a few moments before her testimony did not make the identification procedure unnecessarily suggestive as witness would have seen defendant in any event a few moments later when she took the witness stand) (citing <u>Murray</u>, 65 F.3d at 1169). In this case, Guzman was not ushered into the courtroom to observe Fowler prior to

being called to the stand; he was issued a subpoena and told where the defendant named in the subpoena would be sitting.  (Mot. Hr'g 145.)  At the hearing, Fowler was wearing an orange prison jumpsuit and was seated at the defense table.  (Mot. H'rg Tr. 133-34.)  Even a casual observer would have understood that he was the defendant.[7]

Finally, Fowler has stretched the facts beyond what the record can support when he asserts that prosecutors told Guzman that he would be asked to identify Fowler as the man he saw behind the desk at the Howard Johnson's.  (Pet. 18, 27, 29, ECF No. 1.)  Nothing in Guzman's testimony at the suppression hearing suggests that prosecutors told him that he would be asked to identify Fowler regardless of whether Guzman recognized him as the man he saw at the Howard Johnson's on New Year's Eve.[8]  There was no evidence presented at the hearing that prosecutors or investigators told Guzman or implied to him that Fowler had been arrested based upon Guzman's identification of him in a lineup, that they had other evidence showing that he

---

[7] Fowler does not contend that his presence at the defense table and/or his prison garb were themselves impermissibly suggestive.  Cf. United States v. Peoples, 748 F.2d 934, 935-36 (4th Cir. 1984) (implying that in-court identification of "the only young black male in the courtroom" was suggestive, but holding identification was reliable).  Regardless, responsibility for Fowler's presence and his clothing at the hearing cannot be attributed to the State.

[8] The verbatim exchange between Guzman and defense counsel regarding what prosecutors told him before the hearing was as follows:

> Q: Did they talk to you about the proceedings that were going on in this case and what to expect?
>
> A: Yes.
>
> Q: Did they tell you that Elrico Fowler was going to be at this trial and sitting at the defense table?
>
> A: Yes.
>
> Q: Did they tell you that he was a suspect in this alleged incident that occurred on December 31, 1995?
>
> A: Yeah, his name's on the subpoena.
>
> Q: Did they tell you that he would be sitting between his counsel at the defense table?
>
> A: Yes.

(Mot. Hr'g 145.)

21

was the perpetrator, or that there were others who were expected to identify Fowler as having been at the Howard Johnson's at the time of the crimes. In other words, Fowler has not pointed to any evidence that prosecutors or investigators communicated to Guzman that they expected him to identify Fowler. Absent some evidence that prosecutors pressured Guzman or suggested that he should identify Fowler as the man that he saw, this Court cannot find that the state supreme court applied <u>Simmons</u> unreasonably when it concluded that the pre-trial meeting with prosecutors was not impermissibly suggestive.

The North Carolina Supreme Court also rejected Fowler's argument that investigators and prosecutors engaged in a deliberate process of moving Guzman from an "uncertain" identification of Fowler on January 14, 1996, to a "certain" identification of Fowler at the suppression hearing. <u>Fowler</u>, 548 S.E.2d at 698 ("The sequence of events leading to Guzman's in-court identification was not unnecessarily suggestive."). The trial court observed that if the process had been impermissibly suggestive, Mr. Guzman would have identified the person investigators wanted him to each time. (Mot. Hr'g 151.) Guzman's one pre-trial identification of Fowler, however, was tentative. Additionally, almost two months after Guzman had tentatively identified Fowler, investigators showed him a lineup that did not contain Fowler's photograph. Such a move appears counterproductive to an attempt to move Guzman from uncertainty to certainty that Fowler was the person that he saw at the Howard Johnson's on New Year's Eve.

Based upon the foregoing, the Court concludes that the North Carolina Supreme Court applied <u>Simmons</u> reasonably in determining that the pre-trial identification process in this case was not impermissibly suggestive. <u>See</u> § 2254(d); <u>see also</u> <u>Simmons</u>, 390 U.S. at 384. The

22

Court, therefore, need not address the reliability of Guzman's in-court identification of Fowler at either the suppression hearing or at trial. See Saunders, 501 F.3d at 389 n.1.

Admission of Bharat Shah's Statements to Investigators

Fowler claims that the admission at trial of victim Bharat Shah's statements to Sergeant Anselmo on January 1, 1996, and to Investigator Fish on January 8, 1996, violated Fowler's Sixth Amendment right to confront the witnesses against him. Fowler raised this claim on direct appeal, and the North Carolina Supreme Court held that Shah's statements were properly admitted. Fowler, 548 S.E.2d at 692-97.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him." Crawford v. Washington, 541 U.S. 36, 42 (2004). For the admission of an out-of-court hearsay statement to meet the requirements of the Confrontation Clause, the prosecution must demonstrate that the declarant is unavailable, and the statement itself bears adequate "indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 65-66 (1980), abrogated by Crawford v. Washington, 541 U.S. 36, 53-54 (2004).[9]

The admissibility of Shah's statements was the subject of an extensive pre-trial hearing. Fowler, 548 S.E.2d at 693. Sergeant Anselmo and Investigator Fish each testified that he

---

[9] In Crawford v. Washington, the Supreme Court held that testimonial out-of-court statements are barred from admission at trial by the Confrontation Clause unless the witness is unavailable, and the defendant had prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. 541 U.S. 36, 68 (2004), abrogating Ohio v. Roberts, 448 U.S. 56, 65-66 (1980). Shah's statements to Sergeant Anselmo and Investigator Fish were testimonial. See Crawford, 541 U.S. at 63. Fowler's conviction became final, however, prior to the Supreme Court's decision in Crawford. Consequently, Roberts and its progeny constituted the controlling legal precedent when the North Carolina Supreme Court denied Fowler's direct appeal. See Yarborough v. Alvardo, 541 U.S. 652, 660-61 (2004) ("For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by th[e United States Supreme] Court 'refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'") (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)).

interviewed Shah at the hospital while Shah was recuperating from the gunshot wounds he received on New Year's Eve. (Mot. Hr'g 219, 228-29, Oct. 13-17, 1997.) During each interview, Shah provided a description of the men who committed the crimes at the Howard Johnson's and other details about that night. (Mot. Hr'g 215-16, 232-34.)

After he was released from the hospital in January 1996, Shah moved to California to live with his brother. (Mot. Hr'g 240.) In September, 1996, eight months before Fowler's trial was scheduled to begin, Investigator Sam Price attempted to locate Shah at his brother's house and was told that Shah had gone to India to visit family. Price was told also that Shah was expected to return to California around Christmas. Fowler's trial subsequently was continued until October 13, 1997. On September 9, 1997, Investigator Price again attempted to reach Shah at his brother's house and was told that although Shah had returned to California around Christmas, 1996, he had since moved back to India and had no intention of returning to the United States. On or around October 2, 1997, after repeated calls from Price, Shah's brother produced a phone number for Shah in India. On October 6, 1997, after returning from vacation, Price called Shah and told him that prosecutors wanted him to return to North Carolina to testify at Fowler's trial. Shah refused, stating that his injury from the shooting made it difficult for him to walk or stand for any significant period of time, that he had to use a walker when up for longer than ten minutes, and that the airplane trip, approximately twenty-four hours each way, would be too painful. Shah also expressed fear of returning to the United States. Price offered Shah police protection while he was in Charlotte, but Shah told him that there was nothing Price could do to persuade him to return to the United States. Assistant District Attorney David Graham also spoke with Shah. (Mot. Hr'g 193-207, 300.) Although Price knew the name of the city in India

24

in which Shah lived, he did not have an address for Shah. (Mot. Hr'g 192.)

Based upon the evidence presented, the trial court concluded that Shah was "unavailable" pursuant to N.C. R. Evid. 804(a)(5).[10] (Mot. Hr'g 302.) The North Carolina Supreme Court agreed, citing Shah's refusal to return to the United States because of his injuries and fear for his safety, and the State's inability to determine Shah's exact address. Fowler, 548 S.E.2d at 693. Fowler argues that the State's efforts were not made in good faith because investigators did not attempt to locate Shah sooner or use unspecified "diplomatic government channels" to compel Shah to return.

The United States Supreme Court has ruled that a witness may not be declared "'unavailable' . . . unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, 390 U.S. 719, 724-25 (1968); Roberts, 448 U.S. at 74-75 ("The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness."), abrogated on other grounds by Crawford, 541 U.S. at 53-54. The Court, however, has not identified any particular efforts that prosecutors must undertake to locate missing witnesses. Instead, "'[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness'" in the context of the particular case. Roberts, 448 U.S. at 74 (quoting California v. Green, 399 U.S. 149, 189 n.22 (1970) (Harlan, J., concurring)).

Investigator Price attempted to contact Shah at his brother's home five weeks before trial

_____

[10] North Carolina Rule of Evidence 804(a)(5) defines a declarant as "unavailable" when he "[i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means."

began. Price had confirmed that Shah was living there the previous year, and there is nothing in the record to suggest that investigators or prosecutors knew or suspected that Shah might move back to India or that he had moved back to India. In fact, Shah had been admitted for permanent residence in the United States,[11] an economically valuable immigration status (Mot. Hr'g 197), and had family residing in the United States, both factors that would have weighed against him leaving. Additionally, the record shows that the State issued a subpoena for another prosecution witness, James Guzman, approximately one month before trial. (Mot. Hr'g 223-24.) In short, there is nothing in the record to support Fowler's argument that investigators should have attempted to contact Shah more than five weeks before trial and around the same time as the Guzman subpoena.

As for Fowler's argument that the State should have made efforts to force Shah's return, the Supreme Court has never held that a "good faith" effort requires the performance of a futile act. Cf. Roberts, 448 U.S. at 74 ("[I]f no possibility of procuring the witness exists . . . , 'good faith' demands nothing of the prosecution."), abrogated on other grounds by Crawford, 541 U.S. at 53-54; United States v. Perez-Sosa, 164 F.3d 1082, 1085 (8th Cir. 1998) (holding that to require government to show it could not procure witness's attendance would have been futile where witness had been deported, and his home nation would not extradite an individual based on a material witness warrant) (citations omitted). Shah was beyond the subpoena power of the North Carolina criminal court. While 28 U.S.C. § 1783(a) provides that a United States district

---

[11] "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1105(a)(20).

26

court may issue a subpoena requiring a citizen or resident of the United States who is in a foreign country to appear before a state criminal court, a foreign national residing in a foreign country is beyond the subpoena power of the United States courts.  See United States v. Farfan-Carreon, 935 F.2d 678, 680 (5th Cir. 1991) (observing that because the witness was a foreign national living in his native country, he was beyond the subpoena power of the district court and could not be compelled to appear); United States v. Terrazas-Montano, 747 F.2d 467, 469 (8th Cir. 1984) (holding that witnesses who had been returned to their native country were beyond the reach of process of the district court and that requiring the government to show that they were unable to secure their attendance under the federal rules of evidence would "compel a useless act") (citations omitted). [12]

Fowler has not identified any previously established or available procedure or process by which state prosecutorial authorities could have compelled Shah's attendance.  Cf. Hamilton v. Morgan, 474 F.3d 854, 859-60 (6th Cir. 2007) (citing habeas petitioner's failure to "identify any previously established means of procuring [an overseas witness] to testify at trial" to support conclusion that state court acted reasonably in finding witness unavailable); Mancusi v. Stubbs, 408 U.S. 204, 212-13 (1972) (holding that federal habeas court erred in overturning state court's conclusion that witness residing in a foreign nation was unavailable where the state was powerless to compel the witness's attendance at trial, "either through its own process or through established procedures depending on the voluntary assistance of another government").  The

_____

[12] Fowler has not identified, and this Court was unable to find, any federal case holding that an alien granted permanent resident status in the United States, who had since returned to his native country and was living there permanently, remained a resident of the United States subject to subpoena under 28 U.S.C. § 1783(a).  Moreover, even if the State could have secured a subpoena pursuant to § 1783(a), without an address for Shah in India, the State would not have been able to have him served.

State attempted to persuade Shah to return to North Carolina by offering to pay for his airfare, meals, lodging, and whatever was necessary to care for his injuries, as well as to provide police protection while in Charlotte. Fowler, 548 S.E.2d at 691. Based upon the foregoing, the Court cannot find that the state supreme court unreasonably applied clearly established federal law when it determined that Shah was unavailable to testify at trial. See Hardy v. Cross, 132 S.Ct. 490, 495 (2011) (observing that § 2254(d)'s deferential standard of review does not permit a federal court to overturn a state court's finding of unavailability merely because there were additional steps that might have been taken to procure the witness's attendance).

The state courts also concluded that Shah's statements bore "adequate indicia of reliability," meeting the second requirement for admissibility. Fowler, 548 S.E.2d at 694-95, 697. Sergeant Diego Anselmo testified that he visited Shah in the hospital on January 1, 1996, and spoke to him for about thirty minutes. (Mot. Hr'g Tr. 219.) He testified further that Shah was alert but in pain from his injuries and subsequent surgery, that he had no trouble understanding Shah, and that it was clear by Shah's answers that he understood Anselmo's questions. (Mot. Hr'g 217, 219, 224-26.) Shah told Anselmo that Richmond came into the hotel lobby around 10:45 p.m. looking for ice, and five minutes later two black males came into the lobby. Shah described both as approximately twenty-five years of age, 5'7", and having a thin build. One was wearing a black and gray flannel shirt; the other was wearing a red flannel shirt, but both were wearing red, black-striped ski caps. The man in the red shirt pulled a revolver from his waistband and ordered Richmond to get on the ground. The other man told Shah to open the register. As Shah was handing that man the money from the register, the man with the gun shot Richmond. He then shot Shah. The man with the gun then noticed the safe in the

28

adjoining room and told Shah to open it.  When Shah told him that he did not know the combination, the man shot him again.  Both men left the lobby and proceeded to the parking lot. (Mot. Hr'g 215-16.)

Investigator Fish testified that he interviewed Shah at the hospital on January 8, 1996, for approximately sixteen minutes.  (Mot. Hr'g 228-29, 298.)  According to Fish, Shah was alert, able to understand Fish's questions, and to answer them fully.  (Mot. Hr'g 229-32.)  He stated that Shah was cooperative and agreed to a taped interview.  (Mot. Hr'g 232-34.)  The tape recording of the interview was played at the hearing, and the North Carolina Supreme Court summarized Shah's statement to Investigator Fish as follows:

> Shah . . . gave one of the men approximately $300.00 out of the register.  The man to whom he handed the money was a black male with small eyes and a goatee, and was approximately the same height as Shah, about 5'4".  This man was wearing a black checked flannel shirt and dark toboggan. . . . [T]he man at the end of the counter with the gun was also black and looked similar to his accomplice although he was a little taller.  This man had unshaven hair on his face but not a full beard.  The man was wearing a red checked flannel shirt and dark toboggan.  Shah thought the gun was black and about six inches long.  The man shot Richmond first and then shot Shah in the leg.

Fowler, 548 S.E.2d at 690-91.  Investigator Fish showed photographic lineups to Shah at the interview, and one of the photographs was of Fowler with hair, full beard, and mustache.  Id. at 691.  Shah told Fish that he did not get a good look at the shooter because he was primarily focused on the man taking the money.  Id.  Shah also told Fish that he probably could not recognize the suspects.  Id.

The reliability of a statement can be inferred where the evidence falls within a firmly rooted exception to the hearsay rule.  Roberts, 448 U.S. at 66, abrogated on other grounds by Crawford, 541 U.S. at 53-54.  "Admission under a firmly rooted hearsay exception satisfies the

29

constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." Idaho v. Wright, 497 U.S. 805, 817 (1990) (citations omitted), abrogated by Crawford, 541 U.S. at 61. The trial court admitted Shah's statements under North Carolina's residual exception to the hearsay rule, which is not a firmly rooted hearsay exception. See id. ("The residual hearsay exception . . . accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial. . . . [These] statements . . . therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception.") (citations omitted). To be admissible under the residual exception, the statements must demonstrate "particularized guarantees of trustworthiness" based upon the totality of circumstances under which they were made and that "render the declarant particularly worthy of belief." Id. at 819.

The Supreme Court has "decline[d] to endorse a mechanical test for determining [this question of reliability]," id. at 822, and has left it to the states to develop their own approaches. See Hayes v York, 311 F.3d 321, 326 (4th Cir. 2002) (holding that North Carolina's interpretation of hearsay rule was valid and that state courts as a whole had not erred in their specific interpretations of the state of mind exception). In determining whether a statement has "particularized guarantees of trustworthiness," North Carolina requires courts to consider, "(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-

30

examination." State v. Triplett, 340 S.E.2d 736, 742 (N.C. 1986) (citing State v. Smith, 337 S.E.2d 833 (N.C. 1985)). The Fourth Circuit has held that North Carolina's formula for evaluating whether hearsay evidence has "particularized guarantees of trustworthiness," satisfies Confrontation Clause demands, and is not contrary to United States Supreme Court precedent. See Hayes, 311 F.3d at 327.

In the present case, the North Carolina Supreme Court independently reviewed the record to determine if the State's proffered evidence possessed "particularized guarantees of trustworthiness." Fowler, 548 S.E.2d at 697 (citing Lilly v. Virginia, 527 U.S. 116, 137 (1999) (plurality opinion)). Applying North Carolina's formula, the court concluded that the proffered evidence did possess such guarentees:

> Shah was an eyewitness to the shooting and thus spoke from personal knowledge. Further, Shah was apparently extremely frightened that he might be the victim of further violence and was thus motivated to speak truthfully to law enforcement officers to aid in the quick capture of the perpetrator. Shah never recanted his version of the attack. Moreover, Shah did not make his statements to receive any benefit from the state or to avoid prosecution.

Fowler, 548 S.E.2d at 697.

Fowler does not dispute any of the above findings and conclusions by the state court. Instead, he points to the differences between Shah's description of the two suspects and Guzman's as an indicator of unreliability. As the Supreme Court has explained, however, "particularized guarantees of trustworthiness" must be shown from the totality of the circumstances that surround the making of the statement, not from its consistency with other evidence offered in the case. Wright, 497 U.S. at 822-23. The differences between Shah's description and Guzman's goes to the weight the jury should give Shah's statement, not to its

admissibility.

Several factors demonstrate that the state court reasonably applied Supreme Court precedent in concluding that Shah's statements bore sufficient guarantees of trustworthiness. As an initial matter, its conclusion indicates that when assessing the totality of the circumstances surrounding the making of Shah's statements, the court was mindful of the dangers of admitting out-of-court statements: "[t]he declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener." Williamson v. United States, 512 U.S. 594, 598 (1994).

A reasonable court could have concluded that having witnessed the murder of his colleague, been shot twice himself, and fearing for his safety, Shah had no identifiable motive to lie to investigators, as doing so could have hampered the police in their apprehension of the perpetrators. Moreover, there was no connection between Shah and the perpetrators or Shah and the State, other than the events of December 31, 1995. In other words, Shah had nothing to gain by lying. The substance of Shah's statements concerned a recent event, one in which Shah was a direct participant; so, there was no danger of a fading memory, or a lack of opportunity to witness and understand the event. Shah gave his statements voluntarily, and the interview with Investigator Fish was recorded, minimizing the risk of intimidation by the State or that his words were misunderstood by the listener. Moreover, Shah's statement to Sergeant Anselmo, which came less than twenty-four hours after the shootings and after Shah had undergone surgery on his leg, was consistent with the recorded statement he gave to Investigator Fish seven days later, although less detailed.

Fowler implies that Shah's statements to Anselmo and Fish were not trustworthy because

32

they allegedly contradict Shah's statement to Sergeant Leonard, the first officer at the crime scene. (Pet. 40, ECF No. 1.) According to Sergeant Leonard's testimony at the hearing, when he arrived at the Howard Johnson's, he found Shah lying on his side and bleeding heavily from a gunshot wound in his leg. (Mot. Hr'g 209.) Leonard testified that Shah had difficulty speaking but, in answer to Leonard's questions, stated that two black males had robbed the hotel and that one was wearing a green jacket. (Mot. Hr'g 210.) He also stated that the suspects had been in the hotel earlier. (Mot. Hr'g 211, 213.)

Shah's statement to Sergeant Leonard does not contradict anything that Shah told Anselmo and Fish during his later interviews in the hospital. Instead, it contains two additional facts, which do not cast doubt upon the "particularized guarantees of trustworthiness" identified by the trial court and the North Carolina Supreme Court in concluding that Shah's statements to Sergeant Anselmo and Investigator Fish were admissible.

Petitioner's Statement to Edward Adams

Fowler claims that the trial court violated his right to due process when it excluded a potentially exculpatory statement he made to Edward Adams. The North Carolina Supreme Court held that the trial court did not abuse its discretion under the North Carolina Rules of Evidence or violate Fowler's due process rights when it prohibited Fowler's attorney from questioning Adams about the statement. See Fowler, 548 F.3d at 699-700.

As previously stated, Edward Adams testified at trial that on the evening of January 1, 1996, he bought a .44-caliber revolver from Fowler. (Tr. 638-44.) Adams also testified that he and Fowler had a conversation on April 18, 1996, while they both were incarcerated at the Mecklenburg County Jail. According to Adams, Fowler asked him what had happened to the

33

gun, Adams said that it had been destroyed, and Fowler responded, "I'm glad." Adams also testified that Fowler told him the district attorney thought someone other than Adams had purchased the gun. (Tr. 654, 660-63.) Fowler also told Adams not to tell "the people" about the gun. (Tr. 666.)

On cross-examination, defense counsel asked Adams if during the time he was incarcerated with Fowler, he also heard Fowler say that "[he] didn't do it." (Tr. 669.) The State objected, and the trial court conducted a voir dire outside the jury's presence. After considering the proposed testimony, the court upheld the objection, finding that under the North Carolina Rules of Evidence, the jury did not need to hear Fowler's self-serving statement of innocence to understand Adams's testimony about the gun. (Tr. 674-75.)

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (internal citations omitted); see also Washington v. Texas, 388 U.S. 14, 19 (1967) (indicating that "the right to present a defense" is a "fundamental element of due process of law"). However, a "meaningful opportunity to present a complete defense" does not translate into the right of a defendant to present any evidence that he believes is important to his defense. See Taylor v. Illinois, 484 U.S. 400, 410 (1988) (A defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."). Indeed, it is well established that a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the

34

ascertainment of guilt and innocence." <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973).

"[S]tate . . . rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998) (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 56 (1987)). Furthermore, habeas relief is not warranted "unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." <u>Burkett v. Angelone</u>, 208 F.3d 172, 186 (4th Cir. 2000) (citations omitted); <u>see also</u> <u>Chambers</u>, 410 U.S. at 302-03 (erroneous exclusion of evidence amounts to constitutional error if it deprives the defendant of a fundamentally fair trial).

The rule at issue here is similar to "the rule of completeness," codified as North Carolina Rule of Evidence 106. Rule 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." N.C. R. EVID. 106. The Rule's purpose "is 'to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received.'" <u>United States v. Bollin</u>, 264 F.3d 391, 414 (4th Cir. 2001) (explaining the purpose of Federal Rule of Evidence 106, which is the same as North Carolina Rule of Evidence 106) (quoting <u>United States v. Wilkerson</u>, 84 F.3d 692, 696 (4th Cir. 1996)).

If the state offers part of a defendant's confession into evidence, "the defendant may then introduce other statements made by him if they involve a specific issue related to the inculpatory

35

statements put forth by the state." Fowler, 548 S.E.2d at 699 (citing State v. Vick, 461 S.E.2d 655, 660 (N.C. 1995)).[13]  Such statements may be admitted under this rule, however, "only if they were made during the same 'verbal transaction' as the confession" offered by the state.  Id. (citing Vick, 461 S.E.2d at 660); see also State v. Weeks, 367 S.E.2d 895, 905 (N.C. 1988) (holding defendant's self-serving statement not admissible because it was not made "at the same time" as the oral statements introduced by the state).  Simply introducing a statement made by a defendant does not open the door for the introduction of another statement made by the defendant at some other time.  See State v. Lovin, 454 S.E.2d 229, 237 (1995); State v. Davis, 97 S.E.2d 444, 445-46 (N.C. 1957).  The purpose of this rule is to prevent a defendant from circumventing the hearsay rule, which does not provide an exception for admission of a self-serving, exculpatory statement made by the party seeking admission of the statement.  See N.C. R. Evid. 803.

Fowler does not argue that the aforementioned rule is either "arbitrary or disproportionate to the purpose [it was] designed to serve."  Scheffer, 523 U.S. at 308 (citation and quotation marks omitted).  Nor has he demonstrated that exclusion of his self-serving statement was erroneous.

Adams testified that he and Fowler were incarcerated at the Mecklenburg County Jail's north facility at the same time.  (Tr. 653-54, 657, 672.)  Records introduced by the State showed

_____

[13] Ordinarily, self-serving statements by a defendant are not admissible unless they corroborate the defendant's testimony or the state has opened the door to such testimony by introducing statements made by the defendant.  See State v. Stanton, 353 S.E.2d 385, 392 (N.C. 1987) (finding no error in exclusion of statements made by defendant when the statements were offered for substantive, not corroborative, purposes, and defendant had not yet testified); State v. Davis, 97 S.E.2d 444, 445-46 (N.C. 1957) (holding that excluding statements made by defendant on a specific date on the grounds that they were self-serving was not error where State had not introduced any part of the defendant's conversation from that day).

36

that Adams and Fowler were housed together in Administrative Segregation from April 15

through April 29, 1996, and from May 1 through May 9, 1996. (Tr. 906-09.) From May 4

through May 9, 1996, they were in adjoining cells. (Tr. 909.) Adams's testimony on direct

examination concerned a conversation that he had with Fowler on April 18, 1996. (Tr. 654.)

Defense counsel's question about Fowler's self-serving statement was not limited to a particular

date, however, but incorporated the entire time Adams and Fowler were incarcerated together.

(Tr. 669.)

In an attempt to determine when Fowler asserted his innocence, the trial court conducted

the following voir dire exchange with Adams:

> THE COURT: Tell me exactly how that came about. How those comments came
> about. Was this on the same occasion that you were in administrative detention
> you were talking with him?
>
> WITNESS: Yeah.
>
> THE COURT: Tell me exactly how that comment came about.
>
> WITNESS: It wasn't the same day, but it was during each conversation we had
> about the gun. And it was the first day I got in the hole when we was talking, and
> he asked me – he asked me, do you know what I'm in prison. Do you know what
> they got me down here for?
>
> And I was like, no. And he was like murder at the Howard Johnson's . . .
>
> So after that, he saying, I didn't do it, and then we started talking about other
> things.
>
> THE COURT: Now, tell me exactly what prompted him to say, I didn't do it.
>
> . . .
>
> WITNESS: Because I asked him the question, did he do it? And he said no, he
> didn't do it.
>
>  . . .

37

THE COURT:  Did he say anything else at that time?

THE WITNESS:  Not about the murder.  The conversation was cut, and we went on and talked about something else.

THE COURT:  Was there any other occasion that he told you he didn't do it?

THE WITNESS:  No.  I asked him more than one time, and it was just that one time he told me he didn't do it.  The rest of the times he just said, leave it alone . . .

. . .

[b]ecause there was people in the part we was at that was trying to hear stuff, you know what I'm saying, so they could call other people.

(Tr. 672-74.)  According to the jail records, Adams's first day in Administrative Segregation was April 15, 1996.  During a previous voir dire, Adams testified that Fowler asked him "what'd I do with the gun, time after time after time."  (Tr. 664.)  Adams's voir dire testimony makes clear that he and Fowler had more than one conversation about the gun and whether it had been destroyed, but Fowler asserted his innocence only once.  (Tr. 664, 672-73.)

The North Carolina Supreme Court, which reviewed this issue on direct appeal, was unable to determine from the record whether Fowler's statements about the gun on April 18, 1996, and his assertion of innocence were part of the same verbal transaction.  See Fowler, 548 S.E.2d at 699-700 (finding evidence insufficient to show that Fowler's statements about the gun and his assertion of innocence were part of the same verbal transaction).  Accordingly, it was unable to conclude that the trial court abused its discretion in excluding Fowler's alleged statement of innocence.  Id. at 700.

Whether Fowler's exculpatory statement was made at the same time as his April 18, 1996, gun-related comments was a factual matter for the state courts.  A finding of fact by a state

38

court is presumptively correct absent clear and convincing evidence to the contrary.  See §
2254(e)(1).  This Court has found nothing in the record that clearly and convincingly shows that
Fowler made his exculpatory statement on April 18, 1996, at the same time that he made his oral
statements about the gun and its destruction that the State introduced into evidence.

Furthermore, Fowler's exculpatory statement was not needed to explain or put Adams's
testimony in context.  See State v. Thompson, 420 S.E.2d 395, 403-04 (N.C. 1992) (explaining
that the rule of completeness does not require introduction of statements that are neither
explanatory of, nor relevant to, the statements that have been admitted).  Fowler's assertion of
innocence was not necessary to ensure a fair and impartial understanding of Adams's testimony
about how he came to purchase the gun from Fowler on January 1, 1996, how the gun was
destroyed on January 2, 1996, or what Fowler said to him about the gun on April 18, 1996.
Instead, Fowler's claim of innocence was related to whether he committed the Howard Johnson's
robbery and murder.  Counsel's question on cross-examination was merely an attempt to bring
impermissible hearsay before the jury.  The Due Process Clause does not guarantee that right.

On the facts presented, it appears to this Court that the North Carolina Supreme Court did
not unreasonably applied clearly established federal law when it rejected Fowler's claim on
direct appeal.  His habeas claim, therefore, must be denied.

Guzman's Outburst

As he was leaving the witness stand after completing his trial testimony, Guzman stated
within hearing of the jury and the court reporter, "I hope you fry man.  I really do."  (Tr. 229.)
Defense counsel moved for a mistrial.  (Tr. 238.)  The trial court questioned each juror
individually and excused one juror who thought she observed Fowler smile in response to

39

Guzman's outburst.  The court, however, denied the motion for a mistrial.  Fowler claims that he

was denied a fair trial as a result.  Alternatively, Fowler claims that appellate counsel was

ineffective for failing to raise this issue on direct appeal.[14]

The MAR court held that Fowler's fair trial claim was procedurally barred under N.C.

GEN. STAT. § 15A-1419(a)(3), because it could have been raised on direct appeal.  (Order Den. In

Part MAR and AMAR 30-31, Mar. 10, 2006.)  The court also held that the claim was without

merit and that appellate counsel was not ineffective for declining to raise the issue on direct

appeal.  (Order Den. In Part MAR and AMAR 14 31-35, 37-40.)

A claim is defaulted on federal habeas review if a state court has expressly found that

review is barred by an adequate and independent state procedural rule.  Sharpe v. Bell, 593 F.3d

372, 377 (4th Cir. 2010).  Ordinarily, a federal habeas court will not review a claim that is

procedurally defaulted, see Coleman v. Thompson, 501 U.S. 722, 730-32 (1991), unless the

petitioner demonstrates cause for the default and prejudice resulting therefrom, or that a failure

to consider the claim will result in a fundamental miscarriage of justice, see Wolfe v. Johnson,

565 F.3d 140, 160 (4th Cir. 2009) (citations omitted).  A state court's merits review of a federal

claim as an alternative basis for dismissal does not negate or invalidate the procedural default

holding.  Sharpe, 593 F.3d at 377 (citing Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Ashe v.

--------------------------------------------------

[14] Fowler also contends that the MAR court erred in failing to grant him an evidentiary hearing on this claim.  (Pet. 159, ECF No. 1.)  Whether the MAR court erred is a matter of state law, not constitutional law.  The issue, therefore, is not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").  Furthermore, during state post-conviction proceedings, Fowler and the State stipulated that no evidentiary hearing was necessary for the MAR court to resolve the claim.  (Stipulation of Parties 3 ¶ V.)  Consequently, in addition to not being cognizable on federal habeas review, the issue of whether Fowler should have had a hearing in state court is waived.

Styles, 39 F.3d 80, 86 (4th Cir. 1994)).

The Fourth Circuit repeatedly has held that § 15A-1419(a)(3) is both adequate and independent. See Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008) (citations omitted). Fowler contends, however, that he could not have raised his fair trial claim on direct appeal because the factual basis for the claim was not available until post-conviction. The court reporter apparently captured only part of Guzman's outburst: "I hope you fry man. I really do." (Tr. 229.) Post-conviction counsel reviewed prosecutors' trial notes as part of discovery and found that one of the prosecutors had made the following notation: "I hope you fry man. I really do. Because I'm sure." Fowler argues that because Guzman's entire comment was not part of the official trial record, he could not have raised his fair trial claim on direct appeal.

The Sixth Amendment, made applicable to state criminal proceedings through the Fourteenth Amendment, affords an accused the right to trial by an impartial jury. See Duncan v. Louisiana, 391 U.S. 145, 160 (1968); Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002). An impartial jury is one "capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982). "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial." Remmer v. United States, 347 U.S. 227, 229 (1954). The presumption is rebuttable, and the Supreme Court has long held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Phillips, 455 U.S. at 215 (citing Remmer, 347 U.S. 227; Dennis v. United States, 339 U.S. 162 (1950); Frazier v. United States, 335 U.S. 497 (1948); United States v. Wood, 299 U.S. 123 (1936)).

41

After Guzman made his parting comment to Fowler, the trial judge immediately told the jury to disregard the comments.  (Tr. 229.)  Subsequently, defense counsel moved for a mistrial.[15]  (Tr. 238.)  The court denied the motion but issued a curative instruction to the jury.  (Tr. 240, 243-45.)  The next morning, defense counsel renewed their motion for a mistrial.  (Tr. 258.)  The trial court then questioned each juror individually and on the record, asking each juror if there had been anything that had occurred during the course of the trial that had caused him or her to form an opinion regarding the guilt or innocence of the defendant.  (Tr. 265, 269, 272-73, 275, 277, 282, 285, 286, 293, 296, 298, 302, 306, 308.)  Of the twelve jurors and two alternates, six made reference to Guzman's remarks.  (Tr. 265-66, 270-71, 279, 287-91, 299-300, 302.)  Three jurors—Hair, Carpenter and Connors—expressed doubt that they would be able to eliminate the incident completely from their minds, but all stated that the remarks had not influenced them or caused them to form an opinion regarding Fowler's guilt or innocence.  (Tr. 265-66, 270-71, 287-91.)  A fourth juror, Davis, stated that Guzman's comments had not caused her to form any opinions, but the smile that she observed on the defendant's face at the time of the outburst struck her as odd.  (Tr. 302.)  The trial court denied the motion for a mistrial (Tr. 316), but upon the motion of defense counsel, released Davis and replaced her with an alternate juror (Tr. 451-52).

In explaining his decision to deny the motion for mistrial, the trial judge found that the jurors who had mentioned the episode "indicated . . . a keen understanding of the instructions I

_____

[15] Notably, counsel informed the trial court that he thought Guzman had said something in addition to "I hope you fry, man.  I really do," but that he was unable to hear what it was.  (Tr. 238.)  The judge indicated that he had not heard any additional comment.  (Tr. 238.)  The next morning, Guzman appeared before the trial court to face a contempt citation for his actions, but defense counsel did not ask the trial court to make a record of what Guzman had said the previous day.  (Tr. 253-58.)

42

had given them, of what it means when I grant a motion to strike, or when I tell them to remove something from their memory, or disregard something that had occurred." (Tr. 449.) The trial court also found that while some jurors acknowledged that they might not be able to forget the incident occurred, "they did understand very well the need not to allow that to be part of what they considered in arriving at a verdict . . . [a]nd clearly indicated they would be able to follow that instruction and do that." (Tr. 449.) On the issue of credibility, the court stated the following:

> I've considered not only the answers that the jurors have given that may appear in black and white on the written transcript, when somebody's reviewing this later on, but I've also had an opportunity to look those jurors in the eye, and to observe their demeanor when they were answering these questions. And, I didn't find any of those jurors to be reluctant to make eye contact with me, to appear in any way to be deceptive in their answers, reluctant in their answers, evasive. Nor did I observe any body language whatsoever that caused me any concern. . . . I found each of these jurors. . . . to appear to be very much at ease with the questions that were being asked, with the answers that were being given. It was my impression none of these jurors were trying to hide any information. I found them to be amazingly open and honest and frank in their answers.

(Tr. 450.)

Based upon the foregoing, it is clear that Fowler could have raised his fair trial claim on direct appeal regardless of whether he knew everything Guzman allegedly had said. In the first instance, Guzman's outburst was not a private communication, and it occurred before jury deliberations, which enabled the court to take immediate corrective action. Furthermore, Guzman's "[b]ecause I'm sure" parting comment, which may not have been heard by anyone on the jury, would have been considered, at most, presumptively prejudicial and entitled Fowler to a

43

hearing to assess the impact of Guzman's comments on the jury. [16]  See Phillips, 455 U.S. at 215.

The trial court held such a hearing, asking each juror if there had been *anything* that had occurred

during the course of the trial that had caused him or her to form an opinion regarding the guilt or

innocence of the defendant.  (Tr. 265, 269, 272-73, 275, 277, 282, 285, 286, 293, 296, 298, 302,

306, 308.)  The trial court found no evidence of bias, thereby rebutting any presumption of

prejudice engendered by Guzman's remarks.  Because the trial court investigated and resolved

the juror partiality issue on the record, it was appealable, regardless of whether Guzman's entire

statement was known.  Therefore, absent a recognized exception, Fowler's fair trial claim is

procedurally defaulted.

Ineffective assistance of counsel may constitute cause to excuse a default provided,

however, that the ineffective assistance of counsel claim was itself "presented to the state courts

as an independent claim."  Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  Fowler raised such

a claim in his MAR.

To establish ineffective assistance of counsel, a defendant must show both that counsel's

performance was deficient and that he was prejudiced as a result.  Strickland v. Washington, 466

U.S. 668, 687 (1984).  In order to establish ineffective assistance of appellate counsel before the

state court, Fowler was required to demonstrate "that his counsel was objectively unreasonable in

failing" to identify and argue the fair trial issue, and "a reasonable probability that, but for his

counsel's unreasonable failure . . . , he would have prevailed on his appeal."  Smith v. Robbins,

---

[16] Whether Remmer's presumption of prejudice applies in a situation where there was no private communication with or comment directed at a juror, is an open question.  See e.g. Whitehead v. Cowan, 263 F.3d 708, 724-25 (7th Cir. 2001) (questioning whether Remmer presumption applies in the absence of juror tampering, and collecting cases).  Even if prejudice is presumed under facts such as these, Fowler's claim fails.

528 U.S. 259, 285 (2000) (citation omitted). "[R]eviewing courts must accord appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.'" Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc) (quoting Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993)). Furthermore, competent counsel is not required to raise all nonfrivolous issues on appeal. Bell, 236 F.3d at 164 (citing Smith v. Murray, 477 U.S. 527, 536 (1986) ("Winnowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of effective appellate advocacy.") (citation and internal quotations omitted); Smith v. South Carolina, 882 F.2d 895, 899 (4th Cir. 1989) (observing that counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims")). Consequently, "'only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" Bell, 236 F.3d at 164 (quoting Robbins, 528 U.S. at 288 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986))).

Appellate counsel assigned the trial court's refusal to declare a mistrial as error but did not brief the issue on appeal, thereby waiving it. The MAR court concluded that appellate counsel rendered adequate assistance when he decided to abandon this issue on appeal. The MAR court's conclusion was not unreasonable under Strickland.

In North Carolina, a trial court's denial of a motion for a mistrial is reviewed on appeal for abuse of discretion. See State v. Taylor, 669 S.E.2d 239, 260 (N.C. 2008). "An abuse of discretion occurs when a ruling is 'manifestly unsupported by reason, which is to say it is so arbitrary that it could not have been the result of a reasoned decision.'" Id. (quoting State v. T.D.R., 495 S.E.2d 700, 708 (1998)).

45

The trial court's ruling on Fowler's motion for a mistrial was a reasoned decision. It was based upon juror responses during individual questioning, without objection from the defense regarding the nature of the questions or the length of the questioning, and the judge's observations of each juror's demeanor, willingness, and ability to answer his questions.

Furthermore, the fact that several jurors expressed doubt about their ability to forget about Guzman's outburst is not evidence of actual bias. See Murphy v. Florida, 421 U.S. 794, 800 (1975) ("[E]ven a juror's preconceived conclusion on guilt will not alone rebut the presumption of impartiality if the trial court is satisfied that the juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'") (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)). Fowler has failed to identify any evidence of actual bias on the part of the jurors. He, therefore, cannot show that there is a reasonable probability that he would have been successful on appeal had counsel raised the fair trial issue.

Fowler has not demonstrated cause for his failure to raise his fair trial claim on direct appeal. Nor has he made any effort to demonstrate that a fundamental miscarriage of justice would occur if the Court were not to review his claim. Consequently, there are no grounds for this Court to review his procedurally defaulted claim.

False Testimony Claim[17]

_____

[17] In his MAR, Fowler raised this claim and a related ineffective assistance of counsel claim under the same caption. (MAR 48-67.) The MAR court, without distinguishing between the two claims, held that "[b]ecause this is a claim which could have been, but was not, raised on direct appeal, this claim is procedurally barred in post-conviction pursuant to N.C.G.S. § 15A-1419(a)(3)." (Order Den. In Part MAR and AMAR 12-13.) The MAR court also addressed both issues on the merits. This Court, therefore, need not address the procedural default issue. See Eaton v. Angelone, 139 F.3d 990, 994 n.1 (4th Cir. 1998) ("Because we agree with the district court's denial of Eaton's ineffectiveness claim on the merits, we need not resolve the thorny issue of procedural default."). Fowler's related ineffective assistance of counsel claim is addressed infra.

Case 3:09-cv-00051-FDW   Document 27   Filed 03/27/13   Page 46 of 103

Fowler claims that he was denied his right to a fundamentally fair trial when Jones, Adams, McIntyre, and Fleming testified falsely against him. (Pet. 60, ECF No. 1.) He asserts that all four have since recanted their trial testimony.

In Napue v. Illinois, the Supreme Court reaffirmed the long-standing principle that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. 264, 269 (1959). In Giglio v. United States, the Court further recognized that a prosecutor's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice,'" and violates a defendant's right to due process. 405 U.S. 150, 153 (1972) (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)).

Fowler does not allege in this federal habeas claim that prosecutors elicited false testimony or allowed false testimony to go uncorrected. (Pet. 59-66, ECF No. 1.) Instead, his claim is that his trial was rendered fundamentally unfair when four inmates who had incentives to lie testified falsely against him. (Pet. 60, 61, 63, ECF No. 1.) The MAR court found that Fowler had failed to show that any of the inmates had testified falsely or had recanted his testimony. (Order Den. In Part MAR and AMAR 13-16.)[18]

---

[18] Fowler did not assert prosecutorial misconduct in his MAR either. Instead, Fowler claimed that he was entitled to a new trial under state law because all four inmates had recanted their trial testimony. (MAR ¶¶ 128, 168) (quoting State v. Britt, 360 S.E.2d 660, 665 (N.C. 1987), superseded on other grounds by N.C. GEN. STAT. § 15A–2004(a), (b) (2009)). The North Carolina law Fowler relied upon in his MAR entitles a movant to a new trial based upon recanted testimony if the court hearing the motion is "reasonably well satisfied that the testimony given by a material witness is false, and . . . there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at the trial." Britt, 360 S.E.2d at 665. The law does not require a showing of prosecutorial misconduct.

Notably, Fowler did not claim in his MAR that he was entitled to a new trial under any provision of the U.S. Constitution or a right arising thereunder. "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations

This Court need not review the accuracy of the MAR court's factual findings, however, because the Supreme Court has never held that false testimony unaccompanied by prosecutorial misconduct violates a defendant's right to due process. Cf. Hysler v. Florida, 315 U.S. 411, 413 (1942) (holding that "[m]ere recantation of testimony" does not justify voiding a conviction on due process grounds); see also Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988) (holding that evidence of recantation of critical prosecution testimony was inadequate to raise a constitutional issue where it was unaccompanied by any suggestion of prosecutorial misconduct or the like). Consequently, even if the MAR court's finding of fact was clearly erroneous, and one or more of the inmates did testify falsely, this Court cannot grant Fowler relief without announcing a new rule of federal law–that evidence of false testimony or recantation by a material witness, unaccompanied by any suggestion of prosecutorial misconduct, is sufficient to raise a federal due process claim. Such action is barred, however, by the rule announced in Teague v. Lane, which prohibits federal habeas courts from announcing or applying new rules of

---

of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). Not only did Fowler fail to assert a federal constitutional basis for his claim, this Court was unable to find any case in which a North Carolina appellate court applied federal constitutional law to a motion for a new trial brought pursuant to Britt. Cf. State v. Doisey, 532 S.E.2d 240, 245 n.3 (N.C. App. 2000) (refusing to consider, on appeal from denial of motion for new trial based upon victim's recanted testimony, defendant's argument that admission of the victim's testimony violated his federal due process rights because petitioner failed to raise the constitutional issue before the MAR court) (citing State v. Hunter, 286 S.E.2d 535, 539 (N.C. 1982) ("[A] constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal.")). Moreover, Larrison v. United States, 24 F.2d 82 (7th Cir. 1928), from which the Britt court derived North Carolina's test for determining when a new trial should be granted based upon recanted testimony, itself "has no readily discernible constitutional underpinnings." Turnage v. Fabian, 606 F.3d 933, 939 (8th Cir. 2010) (citations omitted).

Fowler failed to raise this claim in federal constitutional terms in his MAR, and, not surprisingly, the MAR court decided the claim solely on state law grounds. (Order Den. In Part MAR and AMAR 14-16.) Consequently, Fowler failed to exhaust the claim raised in his federal habeas petition in the state courts. See Reese, 541 U.S. at 29. Nevertheless, because Respondent has not raised exhaustion as a defense to this claim, the Court considers it on the merits. See Gray v. Netherland, 518 U.S. 152, 165-66 (1996) (holding that procedural default is an affirmative defense that must be raised by the state if it is not to lose the right to assert the defense thereafter).

Case 3:09-cv-00051-FDW   Document 27   Filed 03/27/13   Page 48 of 103

constitutional criminal procedure.  489 U.S. 288, 310 (1989).[19]

Fowler has failed to state a constitutional ground for relief.  Therefore, his claim must be dismissed.  See § 2254(a).

In a separately-raised claim, Fowler contends that state prosecutors presented evidence they had reason to believe was false.  (Pet. 68, 69, 72, ECF No. 1.)  To the extent that claim is relevant here, Fowler again has failed to identify a constitutional basis for relief.

In Claim IX of the instant petition, Fowler claims that prosecutors violated their obligations under Napue when they failed to disclose alleged reservations about the credibility of two of their witnesses–Waymon Fleming and Leo McIntyre.  (Pet. 68, 69, 72, ECF No. 1.)  The MAR court reviewed a similar claim raised in Fowler's MAR and held that it was without merit because Fowler had failed to provide any factual basis for the claim.  (Order Den. In Part MAR and AMAR 27-29.)

Fowler fairs no better here.  He does not identify any testimony or evidence provided by either Fleming or McIntyre that was false.  Instead, he points to notes in the prosecutors' trial files that, he alleges, show prosecutors had concerns about these two witnesses' credibility.  Specifically, Fowler identifies notes indicating that prosecutors believed Fleming "comes across like an operator," that they considered not using him as a witness (MAR Ex. 60, at 1-2), and that they had "polygraph Leo McIntyre" on a "to do" list (MAR Ex. 64, at 2).  It appears that Fowler's claim is that because prosecutors had concerns about the credibility of those two witnesses, those witnesses testified falsely, and the prosecutors had reason know that they

_____

[19] Teague's restriction is subject to two narrow exceptions not applicable in this case. See 489 U.S. at 311.

testified falsely.  Fowler apparently also believes that the prosecutors were required to disclose their alleged qualms to the defense.

To succeed on a Napue/Giglio claim, a defendant must first demonstrate that a witness testified falsely.  See Napue, 360 U.S. at 269.  The MAR court found that Fowler had failed to show that any of the inmate witnesses testified falsely.  (Order Den. In Part MAR and AMAR 13-16.)  A state court's finding of fact is presumed to be correct, absent clear and compelling evidence to the contrary.  See § 2254(e)(1).  Here, the evidence Fowler cites does nothing more than indicate that prosecutors *may* have had qualms about Fleming's and McIntyre's credibility. It is just as likely that prosecutors' notes indicate concern about how Fleming would come across to a jury as they do concern about Fleming's credibility.  It also is possible that prosecutors considered polygraphing McIntyre to remove a defense attack on his credibility.[20]  Regardless, it should go without saying that evidence that a prosecutor may have had pre-trial qualms of an unspecified nature about a witness's credibility does not demonstrate that the witness testified falsely.  Nor does it demonstrate that the prosecutor knew at trial that the witness testified falsely.  Furthermore, even if prosecutors had reservations about their witnesses' credibility, the State was not required to provide that information to the defense.

There is no clearly established federal law requiring the State to disclose the thought processes, mental impressions, or trial strategies of its prosecutors.  See Goldberg v. United States, 425 U.S. 94, 98 n.3 (1976) (reserving question of whether the government's work product must be disclosed under Brady v. Maryland, 373 U.S. 83 (1963)); see also Morris v. Ylst, 447

---

[20] Defense counsel, in fact, cross-examined McIntyre about whether he had submitted to a polygraph in connection with Fowler's case.  (Tr. 484-85.)

50

F.3d 735, 742 (9th Cir. 2006) ("[A] prosecutor's opinions and mental impressions of the case are not discoverable under <u>Brady</u> unless they contain underlying exculpatory facts."); <u>Williamson v. Moore</u>, 221 F.3d 1177, 1182 (11th Cir. 2000) (concluding that <u>Brady</u> does not require a prosecutor to disclose most "opinion work product," that is, material encompassing only an attorney's mental impressions or legal theories).  Consequently, the MAR court's rejection of this claim did not result in a decision that was either contrary to, or an unreasonable application of, clearly established federal law.  <u>See</u> § 2254(b).

Special Procedures Claim

Fowler claims that he was denied due process of law in violation of the Fifth, Eighth and Fourteenth Amendments to the Constitution when no procedures were used to ensure the reliability of testimony by Jones, Adams, McIntyre, and Fleming, and no special instruction regarding jailhouse informants was given to the jury.  (Pet. 67, ECF No. 1.)  In his MAR, Fowler asserted that jailhouse informant testimony should be tested by some means prior to being presented in a jury trial, especially in capital cases.  (MAR 68-69.)  He argued that without some additional scrutiny given to this type of testimony, there is a reasonable likelihood that false testimony will lead to unreliable verdicts.  (MAR 69.)  Fowler contended that heightened scrutiny procedures should include a pre-trial hearing at which the trial court would determine whether testimony is sufficiently reliable to be presented at trial and jury instruction regarding the interests of jailhouse informants.  (MAR 69.)

The MAR court held that Fowler was in a position to raise this issue on direct appeal, and that because he failed to do so, he was procedurally barred by N.C. Gen. Stat. § 15A-1419(a)(3) from raising it in post-conviction.  (Order Den. In Part MAR and AMAR 19-20.)  Respondent

raises procedural default as a defense to this issue in federal habeas, and Fowler does not contest the accuracy of the MAR court's procedural ruling. Moreover, Fowler has made no attempt to demonstrate cause for his failure to raise the claim on direct appeal or that a fundamental miscarriage of justice would occur should this Court refuse to consider his underlying claim. This claim, therefore, is procedurally defaulted.

Furthermore, there is no federal law requiring state courts to apply heightened scrutiny procedures to jailhouse informant testimony. Cf., Kansas v. Ventris, 556 U.S. 586, 594 n.* (2009) (rejecting, in dicta, suggestion that jailhouse snitches are so inherently unreliable that the Court should craft a broader exclusionary rule for uncorroborated statements obtained by that means and reiterating that the United States legal system "is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses," and that the Court has "long purported to avoid 'establish[ing] [itself] as a rule-making organ for the promulgation of state rules of criminal procedure.'") (quoting Spencer v. Texas, 385 U.S. 554, 564 (1967)).[21] Consequently, to grant Fowler relief, the Court would have to announce a new rule of criminal procedure, retroactive on collateral review, which would run afoul of the Teague rule. See Teague, 489 U.S. at 310.[22]

---

[21] United States v. Henry, 447 U.S. 264 (1980), and Kuhlmann v. Wilson, 477 U.S. 436 (1986), which Fowler cites, are inapposite. In Henry, the Supreme Court held that Henry's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements elicited from him by his cellmate, an undisclosed paid government informant, after his right to counsel had attached. See Henry, 447 U.S. at 270-73. In Kuhlmann, the Court held that the Sixth Amendment does not forbid admission of an indicted defendant's statements to a jailhouse informant who was put in close proximity to the accused but made no effort to elicit information about the crime charged. See Kuhlmann, 477 U.S. at 456. Neither of these cases addressed the reliability of the testimony but dealt solely with whether the rights of defendant had been violated after his Sixth Amendment right to counsel had attached. In this case, there is no allegation that any of the inmates who testified against Fowler elicited statements from him as a paid government informant after his Sixth Amendment rights had attached.

[22] As with a previous claim, neither of the Teague exceptions apply. See 489 U.S. at 311.

52

This claim is procedurally defaulted on federal habeas review.  It is likewise barred by the rule of Teague v. Lane.  See id.  Alternatively, the MAR court's rejection of this claim on the merits did not result in a decision that was either contrary to or an unreasonable application of established federal law.

Brady Claim

Fowler contends that the State violated his right to due process when it failed to provide the defense with prosecutors' notes of an interview with Edward Adams, the fact that Guzman needed glasses to read, and the final sentence of Guzman's outburst before the jury, which was captured by one of the prosecutors.  (Pet. 68-69, ECF No. 1.)  In the state courts, the MAR court denied the claim on the merits.  (Order Den. In Part MAR and AMAR 23-29.)

A state deprives a criminal defendant of due process when it suppresses evidence that is both favorable to the defendant and "material either to guilt or to punishment, irrespective of" whether it suppressed the evidence in good faith.  Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence is favorable not only when it would tend to exculpate the accused, but also when it can be used to impeach the prosecution's witnesses.  See United States v. Bagley, 473 U.S. 667, 676 (1985); United States v. Trevino, 89 F.3d 187, 189 (4th Cir. 1996).  Evidence qualifies as material "if there is a reasonable probability that the proceeding would have resulted in a different outcome had the evidence been disclosed to the defense."  Richardson v. Branker, 668 F.3d 128, 145 (4th Cir. 2012); see also Strickler v. Greene, 527 U.S. 263, 280 (1999).  The key question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).

53

On an undated sheet of paper, found in prosecutors' files by state post-conviction counsel, are hand-written notes of what appears to be a pre-trial interview with Adams, in which he described his interaction with Fowler on the night of January 1, 1996. (MAR Ex. 70.) In his habeas petition, Fowler contends, without identifying how, that the contents of this document are internally inconsistent and inconsistent with other information in the State's files. (Pet. 68, ECF No. 1.) In his MAR, Fowler argued that Adams's description of Fowler's clothing on the night that he sold Adams the gun was contradicted by a police report taken the same night. (MAR ¶ 185.) Adams purportedly told prosecutors that Fowler was wearing "Army camo pants" and a black, hooded sweatshirt" at the time of the sale (MAR Ex. 70), which occurred around 10:00 p.m. on January 1, 1996 (Tr. 682-83). Fowler contends, however, that a police report taken at 9:30 p.m. the same night states that he was wearing a brown jacket, black shirt, and blue jeans. (MAR ¶ 185 (citing MAR Ex. 71).)

MAR Exhibit 71 is a copy of a field interview observation report made during a traffic stop of a vehicle in which Fowler was a passenger. (MAR Ex. 71.) The report shows that the vehicle was stopped on January 1, 1996, at 11:15 a.m., not 9:30 p.m. (MAR Ex. 71.) The MAR court found that Adams's description of Fowler's clothes did not constitute favorable or impeaching evidence. (Order Den. In Part MAR and AMAR 25.) Considering that almost eleven hours passed between the stop and the gun sale, giving Fowler ample time to change clothes, this Court cannot say that the MAR court's conclusion was unreasonable. [23]

---

[23] The MAR court's order states that the vehicle stop occurred at 11:15 p.m. on January, 1, 1996. (Order Den. In Part MAR and AMAR 25.) The CMPD, however, uses "military time." (Tr. 131-32.) Had the stop occurred at 11:15 p.m., the time of the stop would have been noted as 23:15, not 11:15. (Tr. 131-32.) The MAR court's decision was reasonable, regardless.

As for the two issues regarding Guzman, the MAR court concluded that neither was favorable or material under Brady. At the pre-trial hearing on the defendant's motion to suppress, Guzman was asked whether he wore glasses and whether there were any restrictions on his driver's license requiring him to wear glasses. (Mot. Hr'g 127.) Both of Guzman's responses were in the negative. (Mot. Hr'g 127.) Notes from the prosecutors' trial files state that Guzman needed glasses to read but that he never wore them. (MAR Ex. 72, at ¶ IB6.) The notes also state that Guzman's driver's license indicated that he did not need corrective lenses to drive. (MAR Ex. 72, at ¶ IB6.) Based upon the evidence in the record, Guzman did not testify falsely. Furthermore, the MAR court found that whether Guzman may have needed reading glasses "had no impeaching value where the issue at trial was [his] identification of Fowler from about 25 feet away." (Order Den. In Part MAR and AMAR 25.)

Setting aside whether it had any impeachment or exculpatory value, Guzman's outburst upon leaving the witness stand at trial was not Brady material. First, the State did not suppress it. Fowler would not be entitled to relief under Brady if "the information sought [was] otherwise reasonably available." Barnes v. Thompson, 58 F.3d 971, 976 (4th Cir. 1995). "'[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine.'" Id. at 975 (quoting United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)); see also Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002) (Brady "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense.") (citation and internal quotation marks omitted). Guzman made his statement in open court. Defense counsel heard the first two sentences and informed the court that he thought

55

Guzman had said something else. (Tr. 238.) Counsel, however, passed up the opportunity to find out what else Guzman may have said when Guzman appeared before the trial court the next day. (Tr. 253-58.)

Furthermore, Guzman's statement was not material. Counsel moved for a mistrial in the absence of knowing Guzman's full remark, and the trial court conducted a full hearing on the issue, providing Fowler all the process he was due. See discussion supra.

This Court cannot say that the MAR court's resolution of this claim rested upon an unreasonable determination of the facts in light of the evidence or resulted in a decision that was either contrary to or an unreasonable application of Brady. It is, therefore, denied.

### Sufficiency of the Evidence: Armed Robbery of Bobby Richmond

Fowler was charged with two counts of robbery with a dangerous weapon. One count applied to the Howard Johnson's Motel and the other to Bobby Richmond. The trial court denied Fowler's motions to dismiss both counts, and the jury found him guilty of both charges. While Fowler concedes that the evidence was sufficient to prove that the motel's money was stolen, he claims that the evidence was insufficient to show that money belonging to Richmond was stolen. (Pet. 86, ECF No. 1.)

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" Jackson v. Virginia, 443 U.S. 307, 315 (1979) (quoting In re Winship, 397 U.S. 358, 364 (1970)). "[I]t is the responsibility of the jury—not the [reviewing] court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011) (per curiam). "A reviewing court

56

may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Id.

To convict Fowler of the armed robbery of Richmond, the jury had to find beyond a reasonable doubt that Fowler (1) unlawfully took or attempted to take personal property from Richmond (2) by use or threatened use of a firearm or other dangerous weapon (3) thereby threatening or endangering Richmond's life.  See N.C. GEN. STAT. § 14-87; State v. Small, 400 S.E.2d 413, 416 (N.C. 1991) (outlining essential elements of robbery with a dangerous weapon). The North Carolina Supreme Court, which reviewed this claim on direct appeal, properly considered the evidence presented at trial in the light most favorable to the State.  Fowler, 548 S.E.2d at 700; see Jackson, 443 U.S. at 319 (requiring the reviewing court to "view the evidence in the light most favorable to the prosecution") (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)).  In so doing, the court focused on the only controverted issue–whether the evidence was sufficient to permit a rational juror to find beyond a reasonable doubt that Fowler took or attempted to take property belonging to Richmond.  Fowler, 548 S.E.2d at 700.

The court found that, viewed in the light most favorable to the State, the evidence at trial showed that Richmond habitually carried cash in his wallet, that Richmond's wallet, business cards, and birth certificate were lying by his side at the scene of the crime, and that the wallet contained no money when found.  Id.  The court then cited North Carolina law under which evidence of habit can be used to prove an element of a criminal offense.  Id. (citing State v. Howell, 439 S.E.2d 116, 125 (N.C. 1994) (acknowledging in first-degree burglary case that evidence of habit or custom is admissible to establish an essential element of the crime) (citation omitted); State v. Palmer, 431 S.E.2d 172, 176 (N.C. 1993) (finding sufficient evidence to prove

57

element of armed robbery where testimony showed victim always had money, victim's purse had been emptied, and victim's purse contained no money when her body was found); State v. Quick, 405 S.E.2d 179, 184, 191 (N.C. 1991) (holding that the conclusion that an armed robbery occurred during killing was supported in part by evidence that the victim carried money on his person and that the victim's empty wallet was found on the floor next to his body)). The court held that the evidence was sufficient to permit a reasonable jury to find Fowler guilty of robbery with a dangerous weapon of Richmond beyond a reasonable doubt. Id.

Fowler counters that there was other evidence presented at trial that undermined the State's theory that Fowler robbed Richmond. Specifically, none of the inmate testimony regarding Fowler's admissions to robbing the hotel and shooting the employees even hinted that Fowler also robbed Richmond either before or after shooting him.[24]

When a reviewing court is "faced with a record of historical facts that supports conflicting inferences[,]" it "must presume—even if it does not affirmatively appear in the record—that the [jury] resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. It was not error, therefore, for the North Carolina Supreme Court to defer to the jury's verdict after viewing all of the evidence in the light most favorable to the State. Nor was it unreasonable for the North Carolina Supreme Court to conclude that there was sufficient evidence from which a rational trier of fact could find Fowler

_____

[24] Fowler also asserts that another wallet, containing money, was found in the pocket of some bloody clothes that were on the floor "in the vicinity" of Richmond's body. Fowler contends that evidence of the wallet's ownership was never introduced and concludes that it could have been Richmond's wallet. While Fowler technically is correct that ownership of the wallet was never introduced, ownership of the clothes in which the wallet was found was introduced at trial. One of the medics who responded to the Howard Johnson's identified the owner of the bloody clothing as Bharat Shah. (Tr. 441.) She testified that she and her partner cut away Shah's clothing to see where he was injured and that they left the clothing behind when they took Shah to the hospital. (Tr. 437, 439-41.)

58

guilty "beyond a reasonable doubt of every fact necessary to constitute the" crime of robbery

with a dangerous weapon of Bobby Richmond.  In re Winship, 397 U.S. at 364.

Ineffective Assistance of Counsel Claims

Counsel's strategy for the guilt phase of Fowler's trial was to raise reasonable doubt that

Fowler was involved in the Howard Johnson's robbery and murder.  (Mot. Hr'g 21; Trial Tr.

112-20.)  In furtherance of that strategy, counsel primarily limited their cross-examination of

witnesses to those matters that might cast doubt about whether Fowler was the perpetrator of the

crimes.  For example, counsel cross-examined Sergeant Andy Leonard, the first officer on the

scene, about the presence of an unidentified automobile in the parking lot and whether Guzman

had told him an African-American woman entered the lobby immediately after the murder and

then left in a Subaru.  (Tr. 160-63.)  On cross-examination of Sergeant Anselmo, counsel elicited

evidence that on January 11, 1996, Guzman was shown a photo lineup containing a photo of

Cullen Marshall and that Guzman identified his photo as resembling the man he saw at the

Howard Johnson's.  (Tr. 369.)  Defense counsel also called lead Investigator Fish as a hostile

witness and used their questioning of him to imply that the police ignored or neglected any lead

or evidence that indicated that someone other than Fowler had committed the Howard Johnson's

crimes.  (Tr. 975-80, 988-99, 1004-05.)

Additionally, defense counsel attempted to undermine the credibility of the four felons

who testified against Fowler by calling into question their motives for testifying.  Counsel

implied through their questioning that the witnesses had obtained favorable plea agreements,

dismissals or reductions of pending criminal charges, and lighter sentences in other state and

federal cases in exchange for their testimony against Fowler.  They elicited on cross-examination

59

that three of the four witnesses did not tell anyone in law enforcement about what they allegedly knew about the Howard Johnson's crimes until months after acquiring the information, that two of the four had contacted law enforcement offering to exchange information for help with pending cases, and that at least two of the four had made deals in other cases to testify against co-defendants in exchange for favorable plea deals with the government.

Finally, counsel presented an alibi witness who testified that Fowler had been at her home during the time that the Howard Johnson's crimes took place. (Tr. 948-50.) Shenitra Johnson, the host of the New Year's Party that Fowler attended, also testified that although Fowler was in possession of a handgun on New Year's Eve, it was a small, semi-automatic pistol, not a .44 revolver. (Tr. 951-52.) Moreover, she testified that Fowler never sold a gun of any kind at her apartment and that she did not know anyone by the name of Edward Bernard Adams. (Tr. 951, 953.)

In his habeas petition, Fowler does not contend that counsel's defense strategy was unreasonable or that they should have adopted a different one. Instead, Fowler's claim is that counsel performed ineffectively at trial and that he was prejudiced as a result because they did not do more in pursuit of that strategy. Specifically, he alleges that counsel should have sought the assistance of an expert in eyewitness identification to undermine Guzman's pre-trial and in-trial identification; hired a forensic expert to dispute the State's theory and evidence about how Richmond was positioned when he was shot; cross-examined the four jailhouse informants regarding discrepancies between their prior statements and their testimony; and investigated and presented a stronger alibi defense.

To establish ineffective assistance of counsel, a defendant must show both that counsel's

60

performance was deficient and that he was prejudiced as a result. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686.

An analysis of counsel's performance must begin with a presumption by the reviewing court that counsel "'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1403 (2011) (quoting <u>Strickland</u>, 466 U.S. at 690). To overcome that presumption and establish deficient performance, the defendant must show "that counsel failed to act 'reasonabl[y] considering all the circumstances.'" <u>Pinholster</u>, 131 S.Ct. at 1403 (quoting <u>Strickland</u>, 466 U.S. at 688); <u>Rompilla v. Beard</u>, 545 U.S. 374, 380 (2005) (stating that, under <u>Strickland</u>, counsel's performance is "measured against an objective standard of reasonableness, under prevailing professional norms") (citations and internal quotations omitted). When the more highly deferential § 2254 standard is applied, the petitioner must demonstrate that there is "[no] reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 131 S.Ct. at 788.

To establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> It is not enough, however, "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u> at 693. Counsel's errors must be substantial enough "to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at

61

687.

Fowler raised his ineffectiveness claims in his MAR and AMAR. (MAR 12-43, 50-64, 66-67; AMAR 20-25.) The MAR court held an evidentiary hearing on several of Fowler's ineffectiveness claims, but ultimately denied all of them on the merits, correctly identifying Strickland as the clearly established Supreme Court precedent governing ineffective assistance of counsel claims. (Order Den. In Part MAR and AMAR 8, 13, 16-18, 69-72, March 10, 2006; Order Den. Remainder of MAR and AMAR 11-32, Oct. 22, 2007.) The question before this Court is whether the MAR court's application of Strickland "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786–87.

## Eyewitness Identification Expert

Fowler claims that counsel were ineffective for failing to hire an expert in eyewitness identification to explain to the jury the "numerous factors indicating that James Guzman's identification of Fowler was unreliable." (Pet. 5, ECF No. 1.) The MAR court held an evidentiary hearing on this claim, and the defense presented the testimony of Dr. Spurgeon Cole, who was accepted by the court as an expert witness in the field of clinical psychology and perception, including eyewitness identification. (MAR Hr'g 176.) The defense also presented the testimony of trial attorneys Kevin Barnett and the late Harold Bender. After considering all of the admitted evidence, the MAR court denied the claim on the merits. (Order Den. Remainder of MAR and AMAR 26, 31-32.)

Had he been called as a witness at trial, Dr. Cole would have testified that in his professional opinion, it was "likely to a high degree of scientific certainty that Mr. Guzman

62

misidentified Mr. Fowler." (MAR Hr'g 208.) Dr. Cole testified that Guzman was in an

"emotionally roused state" and observed the subject for only a few seconds from a fairly long

distance, all of which were unfavorable in terms of making an accurate identification. (MAR

Hr'g 188-89, 191.) Additionally, investigators showed Guzman successive photo arrays in

which a photograph of Fowler was the only common denominator. (MAR Hr'g 181-82, 212.)

Such a procedure, Dr. Cole testified, made it likely that Guzman picked Fowler's picture out in

the second array because he remembered Fowler from the first array and not from the crime

scene. (MAR Hr'g 182.) Dr. Cole also testified that studies had shown no correlation between a

witness's confidence in identifying a suspect and the accuracy of that identification. (MAR Hr'g

194-95.)

     Bender, who was lead trial counsel, testified that he did not think that he gave any

consideration to using an eyewitness expert in the case. (MAR Hr'g 542.) He acknowledged

that he was aware of the developing body of research regarding the accuracy of eyewitness

identification. (MAR Hr'g 542.) In fact, Bender had attempted to use an eyewitness expert in

two prior cases, both without success.[25] See State v. Abraham, 451 S.E.2d 131, 148-49 (N.C.

1994); State v. Suddreth, 412 S.E.2d 126, 132-33 (N.C. App. 1992). Barnett, who professed

ignorance regarding the science of identification, memory, and perception as it existed in 1997,

was second chair to Bender in the Abraham case.[26] (MAR Hr'g 361.)

     In considering the deficiency prong of the Strickland analysis, the MAR court looked at

---

[25] Bender's testimony implied that he had attempted to use an eyewitness identification expert in only one prior case–State v. Suddreth, 412 S.E.2d 126 (N.C. App. 1992). (MAR Hr'g 542.)

[26] Bender and Barnett represented Patrick Cureton, Abraham's co-defendant. (MAR Hr'g 361); Abraham, 451 S.E.2d at 145.

case law existing at the time of Fowler's trial. In addition to expressing doubt that counsel would have been provided funds to employ an eyewitness identification expert, the court determined that it would not have been unreasonable for trial counsel to conclude that eyewitness expert testimony would not be admissible at trial. (Order Den. Remainder of MAR and AMAR 27-29, 31.) The court also determined that "given the inconsistencies of James Guzman's identification of Fowler, it would not be unreasonable for trial counsel to conclude that cross-examination of James Guzman would be more effective and meaningful to the jury." (Order Den. Remainder of MAR and AMAR 28-29, 31.) The MAR court concluded that Fowler had failed to overcome Strickland's presumption that counsel's actions "might be considered sound trial strategy." (Order Den. Remainder of MAR and AMAR 31 (citing Strickland, 466 U.S. at 689).)

Fowler counters, without citing any supporting case law, that under "prevailing standards at the time" reasonable counsel would not have been concerned that testimony by an identification expert might be ruled inadmissible. (Pet. 14, ECF No. 1.) With respect to the likelihood of obtaining appointment of an eyewitness expert, Fowler merely asserts that the case in which Bender and Barnett were denied funds for an eyewitness expert "could not have been more different from Fowler's case." (Pet. 13, ECF No. 1.)

In Ake v. Oklahoma, the United States Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. 68, 74 (1985). North Carolina has relied on the Court's rationale in Ake to provide indigent defendants access to other

64

types of expert assistance.  See State v. Moore, 364 S.E.2d 648 (N.C. 1988) (fingerprint expert); State v. Penley, 347 S.E.2d 783 (N.C. 1986) (pathologist); State v. Johnson, 344 S.E.2d 775 (N.C. 1986) (medical expert); State v. Hickey, 346 S.E.2d 646 (N.C. 1986) (investigator).  Such experts need not be provided, however, unless the defendant "makes a threshold showing of specific necessity for the assistance of the expert requested."  State v. Moore, 364 S.E.2d at 652 (citation and internal quotation marks omitted).  To make a "threshold showing of specific [need]" for the expert sought, "the defendant must demonstrate that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case."  Id.

Between the Ake decision in 1985 and Fowler's trial in October 1997, the North Carolina appellate courts reversed only two convictions on the grounds that the defendant was denied the assistance of a non-psychiatric expert, despite having made a threshold showing of specific need. See Moore, 364 S.E.2d at 656-58; State v. Bridges, 385 S.E.2d 337, 339 (N.C. 1989).  In Moore, a divided North Carolina Supreme Court held that the defendant had demonstrated a specific need for a fingerprint expert.[27]  364 S.E.2d at 653, 656-58.  The court identified three circumstances that together met the requisite threshold showing of specified need:  (1) absent a fingerprint expert, Moore would be unable to adequately assess the state's expert's conclusion that Moore's palm print was found at the scene of the attack; (2) because the victim could not identify her assailant, the testimony by the state's fingerprint expert was crucial to the state's

_____

[27] The court also determined that Moore had presented sufficient evidence of mental retardation and other cognitive difficulties to make the requisite threshold showing of need for the assistance of a psychiatrist in the preparation and presentation of his defense.  Moore, 364 S.E.2d at 653, 656.  The court held that the trial court had committed reversible error when it had denied Moore's request for appointment of a psychiatrist.  Id. at 656.

65

ability to identify Moore as the perpetrator of the crimes; and (3) Moore's mental retardation limited his communication and reasoning abilities, and thus could provide little assistance to defense counsel in making a defense. Id. at 657.

Likewise, in Bridges, a divided North Carolina Supreme Court held that the defendant had demonstrated a specific need for a fingerprint expert where latent prints found at the crime scene were the only direct evidence linking Bridges to the crime. 385 S.E.2d at 339. The factors demonstrating that Bridges showed a specific need for a fingerprint expert and would have been "materially assisted in the preparation of his defense" had the trial court granted his motion were: (1) that the experts who testified about the preparation and identification of the latent prints found at the crime scene worked for the State, and without his own expert to examine the items found at the crime scene and compare any latent prints to his own fingerprints, Bridges was unable to adequately assess the State's experts' conclusions that the latent prints from the crime scene were his; and (2) that because fingerprint evidence was the only direct evidence linking Bridges to the crimes, this evidence was critical to the State's ability to identify him as the perpetrator of the crimes. Id. at 339.

In State v. Abraham, the North Carolina Supreme Court held that the trial court did not err in denying defendant Cureton the assistance of an eyewitness identification expert at trial. 451 S.E.2d at 148-49. Noting that "[t]his is not a case involving the uncorroborated identification of a single eyewitness," but a situation where Cureton and Abraham were identified by a number of witnesses who knew them, the court determined that Cureton had failed to show that the identity of the shooters was a significant issue at trial. Id. at 149. The court also concluded that Cureton had failed to show that an eyewitness expert would have

66

provided material assistance in the preparation and presentation of his defense because the identification issues for which Cureton sought expert assistance–time of observation, distance of observation, lighting conditions, inconsistencies in witness's testimony, and age of the eyewitness–"involved matters within the scope of the jury's general capability and understanding." Id. The court observed that "[Cureton] had opportunity during cross-examination, which he exercised, to emphasize any inconsistencies in testimony as well as to underscore other factors such as lighting conditions or distance which would have affected the accuracy or credibility of the identifications." Id. The assistance of an expert, the court decided, "would have been of marginal additional value as to these points." Id. Abraham was the only post-Ake appellate decision in North Carolina before Fowler's trial to address whether a defendant had met the necessary threshold for appointment of an eyewitness identification expert.

Prior to Abraham, the appellate courts reviewed cases on direct appeal in which an eyewitness identification expert had been appointed. See State v. Floyd, 445 S.E.2d 54, 59 (N.C. App. 1994); State v. Suddreth, 412 S.E.2d 126, 132-33 (N.C. App. 1992); State v. Robinson, 409 S.E.2d 288, 301-02 (N.C. 1991); State v. Cotton, 394 S.E.2d 456, 460 (N.C. App. 1990); State v. Knox, 337 S.E.2d 154, 157 (N.C. App. 1985). The issue on appeal in those cases was the admissibility of the expert's testimony, not the appointment itself, so the reviewing courts do not state the grounds upon which the appointments were made. Nevertheless, there are facts common to each that could have supported a showing of specific need for an eyewitness expert. See Floyd, 445 S.E.2d at 59 ("[T]he State's entire case was based on eyewitness testimony."); Suddreth, 412 S.E.2d at 128 (only direct evidence linking defendant to rape was victim's

67

testimony; victim's attacker wore a mask, and victim did not positively ID defendant as her attacker until day before trial); Cotton, 394 S.E.2d at 457 (state's entire case based upon eyewitness testimony of victims in two separate sexual assaults, and victim of second assault was unable to identify defendant as her assailant in photographic lineup); Knox, 337 S.E.2d at 156 (only evidence against defendant was eyewitness testimony of victim).

To quote Abraham, "[Fowler's was] not a case involving the uncorroborated identification of a single eyewitness." 451 S.E.2d at 149. Guzman's identification was not the only direct evidence linking Fowler to the Howard Johnson's crimes. As late as the hearing on Fowler's motion to suppress Guzman's in-court identification, defense counsel expected Marshall to testify at trial that he drove Fowler to the Howard Johnson's on New Year's Eve and that upon returning to the car, Fowler told him that he had shot two people inside. (Mot. Hr'g 20; MAR Hr'g 458, 470.) Additionally, counsel knew that the State had several witnesses who would testify that Fowler had admitted to them that he had committed the Howard Johnson's crimes. Finally, unlike the situation in Moore and Bridges, where the defendants were unable to assess the accuracy of the State's evidence without an expert, there were other means by which to assess the reliability of Guzman's identification. It was not unreasonable, therefore, for the MAR court to conclude that, given the state of the law in North Carolina in 1997, reasonable counsel in Bender and Barnett's position might not have considered seeking expert assistance.

Moreover, appointment of an eyewitness expert was no guarantee that the expert's testimony would be admissible at trial. In State v. Knox, the North Carolina Court of Appeals addressed the admissibility of expert testimony on memory variables affecting eyewitness

identification.  Id.  Relying on Rules 403 and 702 of the North Carolina Rules of Evidence,[28] the court stated that,

> Expert testimony is properly admissible when it can assist the jury to draw certain inferences from facts because the expert is better qualified.  The test for admissibility is whether the jury can receive "appreciable help" from the expert witness.  Applying this test requires balancing the probative value of the testimony against its potential for prejudice, confusion, or undue delay.  Even relevant evidence may be excluded if its probative value is outweighed by the danger that it will confuse or mislead the jury.

Id. (internal citations and quotations omitted).

According to Dr. Cole, Guzman's "emotionally roused state," the time he had to observe the subject, and the distance at which he observed the subject hampered Guzman's ability to make a positive identification of the man he saw at the Howard Johnson's.  (MAR Hr'g 188-89, 191.)  In Abraham, the North Carolina Supreme Court concluded that identification issues such as time and distance of observation, lighting conditions, and age of an eyewitness "involved matters within the scope of the jury's general capability and understanding."  451 S.E.2d at 149.

Dr. Cole also testified that the use of two photo arrays in which a photograph of Fowler was the only common denominator tainted the identification process and created the possibility that Guzman chose Fowler's photo because his memory was triggered by having seen Fowler's face in an earlier photograph rather than at the Howard Johnson's.  (MAR Hr'g 181-82, 212.)  In

---

[28] "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion."  N.C. R. Evid. 702(a) (1995).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  N.C. R. Evid. 403 (1983).

69

State v. Cotton, however, the North Carolina Court of Appeals found no error in the trial court's exclusion of expert testimony that "lighting, stress, cross-racial identification, priming of memory, unconscious transfer, and loss of memory over time affected the eyewitness identification." 394 S.E.2d at 459. The trial court found the evidence to be relevant, but "not so . . . misapprehended by lay persons as to make expert testimony concerning their application of more than minimal value and assistance to a jury." Id. The trial court also concluded that admission of the evidence would be unduly prejudicial in the defendant's favor. Id. at 459-60 ("Emphasis on the frailty of human perception presented by an unbiased expert in such matters, in itself, constitutes an argument of potentially substantial weight in favor of the accused."). Furthermore, Dr. Cole's testimony throughout direct examination leaves the misimpression that Guzman was shown only two photo lineups and that each had a photo of Fowler. Guzman, however, was shown a total of seven photo lineups over a three-month period. He was shown three on January 8, 1996, one of which included Fowler's photo. (MAR Ex. 39, at 1.) Three days later, Guzman was shown two more lineups, one with a picture of Marshall and the other with a picture of Vontez Ashford, Fowler's cousin. (MAR Ex. 39, at 1.) Guzman stated that Marshall's photo resembled one of the individuals at the Howard Johnson's, but he "could not say for sure." (MAR Ex. 39, at 1.) With respect to the Ashford lineup, Guzman stated that "#4 resembles one of the individuals except with darker skin." (MAR Ex. 39, at 1.) Three days after that, on January 14, 1997, Guzman was shown his sixth photo lineup and from it chose a photo of Fowler, telling Investigator Fish that it most closely resembled the man at the motel, but that he was unable to state for sure that it was the man he had seen. (Mot. Hr'g 85, 120, 133.) Two and half months later, Guzman was shown a final photo array from which he chose two more

men as most closely resembling the man he saw on New Year's Eve. (Mot. Hr'g 85, 103.) In short, Fowler was the third of five men Guzman had identified as resembling the man he saw at the Howard Johnson's on New Year's Eve and the only one whose picture was shown to Guzman more than once. Under these circumstances, reasonable counsel in Bender and Barnett's situation could have concluded both that an eyewitness expert was in no better position than the jury to assess the credibility of Guzman's in-court identification and that, given the holdings of the North Carolina appellate courts, a trial court would be likely to reach the same conclusion.

Finally, Fowler contends that had counsel interviewed Guzman prior to trial, they would have discovered that after he identified Fowler in the photo lineup, police told Guzman that the person he had picked had boasted about committing the murder. (Pet. 7, 9, 12, 15, ECF No. 1.) Guzman, however, testified at the evidentiary hearing that the police never told him that he had picked the right person. (MAR Hr'g 224, 227.) As previously noted, Guzman was shown seven lineups, out of which he identified five men who looked like the man he had seen at the Howard Johnson's on New Year's Eve. Guzman testified at the evidentiary hearing that at some point after he had picked someone out of a lineup, he was told by a law enforcement officer, that the person he had picked had boasted about killing someone and then buying drugs. (MAR Hr'g 223-26.) Guzman did not testify that the man he had picked was Fowler or that the unidentified law enforcement officer told him that the man he had picked had admitted committing the murder at the Howard Johnson's.

The MAR court's conclusion that reasonable counsel in Bender and Barnett's position might not have retained or sought funds for an eyewitness identification expert was not "so

71

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786–87. As such, the MAR court's rejection of this claim was not the result of an unreasonable application of Strickland.

Forensic Expert

Dr. Michael Sullivan, M.D., the forensic pathologist who autopsied Richmond's body, testified at trial that Richmond was shot in the back from close range while he was lying on the floor. (Tr. 916-19, 922.) In closing arguments at trial and at sentencing, prosecutors argued that Fowler "executed" Richmond by shooting him in the back while he lay helpless on the floor. Fowler contends that counsel should have hired a forensic expert to challenge the State's evidence about how Bobby Richmond was shot.

Fowler raised this claim in his AMAR and supported it with an affidavit of Marilyn Miller, Assistant Professor of Forensic Science at Virginia Commonwealth University. (AMAR Ex. 2, at ¶ 1.) Professor Miller opines that Richmond was not shot while lying on the floor, as the State claimed, but was either ducking, falling to the floor, or rising from the floor when shot. (AMAR Ex. 2, at ¶¶ 1, 10.) Professor Miller also observed that the State did not conduct a distance study of the gunshot residue patterns on Richmond's clothing and skin to determine with certainty the distance between the shooter and Richmond at the time of the shooting. (AMAR Ex. 2, at ¶ 11.) The MAR court rejected this claim on the merits without an evidentiary hearing, noting that the defense theory of the case was that Fowler did not participate in the Howard Johnson's crimes and that Richmond's position relative to the shooter was not relevant

72

to who shot him.[29]  (Order Den. In Part MAR and AMAR 68, 69, 70-71.)

Fowler counters that there is no evidence in the record that counsel's decision not to challenge the State's theory of how Richmond was shot was a tactical or strategic one.  (Pet. 46-67, ECF No. 1.)  He also argues that had counsel called a forensic expert to challenge the pathologist's testimony, the State would have lost a powerful argument at trial and at sentencing that Fowler "executed" Richmond.

In addition to the pathologist, the State called as witnesses a radiologist, who testified about the x-rays of Shah's wounded leg (Tr. 494-500), the trauma surgeon who performed the initial surgery on Shah and collected bullet casing fragments from his leg (Tr. 500-24), one of the crime scene technicians who processed the scene at the Howard Johnson's (Tr. 533-80), the technician at the CMPD crime lab who processed the fingerprint evidence from the crime scene (Tr. 581-95), and the technician at the CMPD crime lab who conducted the ballistics analysis (Tr. 725-48, 751-52.)  None of the State's forensic evidence connected Fowler to the crimes.

Reasonable counsel could have concluded that challenging the accuracy of any of the forensic evidence or expert opinions under those circumstances would have been inconsistent with their theory of the defense and could have damaged their credibility in the eyes of the jury. Additionally, reasonable counsel could have concluded that such a challenge might magnify the importance of the witness's testimony in the minds of the jurors and distract them from the fact

_____

[29] The MAR court also concluded that this claim "could have been, but was not, raised on direct appeal" and, therefore, was procedurally barred in post-conviction pursuant to N.C.G.S. § 15A-1419(a)(3).  (Order Den. MAR and AMAR 68.)  The Court need not address the procedural issue, however, because the MAR court also rejected the claim on the merits.  See Eaton v. Angelone, 139 F.3d 990, 994 n.1 (4th Cir. 1998) ("Because we agree with the district court's denial of Eaton's ineffectiveness claim on the merits, we need not resolve the thorny issue of procedural default.").

73

that none of the forensic evidence connected Fowler to the crimes.

The MAR courts conclusion that counsel engaged in just such strategic thinking is supported by the record.  Counsel did not challenge the accuracy of any of the forensic witnesses' work or their conclusions but largely limited their cross-examination to those areas that could support an inference that Fowler was not involved in the crimes.  For example, counsel used cross-examination of the crime scene technician to reveal that the only fingerprint she had collected at the scene did not belong to Fowler.  (Tr. 573-76, 580.)  During cross-examination of the crime lab technician who processed the fingerprint evidence, counsel elicited evidence that investigators had unsuccessfully attempted to match Fowler's prints to prints found at the Howard Johnson's subsequent to a November 23, 1995 robbery.  (Tr. 597-600.)  Additionally, counsel elicited evidence that the technician was asked to compare only Fowler and Marshall's prints to those from the earlier crime.  (Tr. 601.)  With respect to the ballistics evidence, counsel did not challenge the State's theory that Richmond and Shah were shot with the same .44 revolver.  Instead, counsel elicited evidence from the ballistics expert that the shooter could have used one of a number of different types of .44 caliber revolvers and not necessarily a Ruger .44 Magnum Super Blackhawk, the type of weapon that Fowler allegedly sold to Edward Adams.  (Tr. 745-46, 748-50.)  In short, counsel's approach to the forensic witnesses was consistent and gave every indication of being tactical.

Furthermore, Fowler has failed to show that he was prejudiced at trial or at sentencing by counsel's approach to the State's forensic evidence.  Nothing in Professor Miller's affidavit undermines the State's evidence of malice or premeditation and deliberation necessary to support a first-degree capital murder conviction.  Nor does it undermine the State's evidence of an

74

aggravating circumstance necessary to support a death sentence.

Both Richmond and Shah were shot while they were behind the check-in counter. (Tr. 136.) Richmond's body was found to the left of and parallel to the counter. (Tr. 136-37.) He was face down with his arms above his head and his feet and legs in the walkway that provided access from the lobby to the area behind the counter. (Tr. 136-37.)

The pathologist testified that Richmond was shot at close range and that the bullet entered the center of his back at about chest level and travelled upward and to the left, exiting just above his left nipple. (Tr. 916-18.) The bullet was found imbedded in the carpet beneath the exit wound. (Tr. 335-36.) Based upon the trajectory of the bullet, the pathologist opined that the shooter was standing to the right of Richmond's legs or feet and that an area of abrasion next to the exit wound indicated that Richmond's body was against a hard surface when the bullet exited his body. (Tr. 922.)

Shah told Investigator Fish that the shooter told Richmond to lie down and that during the robbery the shooter was standing at the end of the counter, near Richmond. (Tr. 1011-12; MAR Ex. 1, at 5, 7, 9, 11.) The State introduced evidence that the check-in counter was of sufficient height that Shah could only see Fowler and his partner from the waist up. Shah told Investigator Fish that the man with the gun shot Richmond as Shah handed money to the man's partner and then immediately shot Shah, hitting him in the leg. Due to the height of the counter, Fowler had to have been standing on the same side of or close to the counter to have hit Shah in the leg. Guzman testified that when he looked out of his restaurant window after hearing the third shot, he saw Fowler standing behind the counter and looking down. (Tr. 187.)

Based upon the State's evidence, a reasonable jury could have concluded that Fowler was

standing in the walkway at the end of the counter or next to the counter when he shot Richmond. A reasonable jury also could have concluded that, based upon the position of Richmond's body, relative to the counter and the walkway, Fowler was standing close to Richmond when he shot him. Finally, a reasonable jury could have concluded that Richmond was lying face down on the ground when shot.

In her affidavit, Professor Miller states her belief that "Bobby Richmond was shot while he was ducking down or falling to the floor, or while he was rising up from the floor, rather than as he was lying prone on the floor." (AMAR Ex. 2, at ¶¶ 1, 10.) She does not identify the evidence upon which that belief is based. Regardless, whether the bullet entered Richmond's back while he was lying down, ducking, falling, or rising from the floor, Professor Miller does not dispute that he was in a defenseless position when he was shot in the back by someone shooting downward. If, as Fowler contends, Professor Miller concluded that "the shot that killed Richmond was not fired execution-style, as the State maintained" (Pet. 43, ECF No. 1), she did not mention it in her affidavit.

Ms. Miller also did not dispute that Richmond was shot at close range. She merely observes, correctly, that nothing in the record indicates that the State conducted a distance study of the gunshot residue patterns on Richmond's clothes and body to support the pathologist's testimony that he was shot at close range. (AMAR Ex. 2, at ¶ 11.) Her affidavit did not address any of the State's evidence that supported the pathologist's testimony.

In short, Fowler's evidence, which does not address the timing and sequence of the three shots that killed Richmond and severely wounded Shah, would not have countered the State's argument that Fowler executed Richmond and then attempted to kill Shah to eliminate them as

76

witnesses. Consequently, the MAR court did not apply <u>Strickland</u> unreasonably when it concluded that Fowler was not prejudiced by counsel's approach to the State's forensic evidence of how Bobby Richmond was shot.

Cross-Examination of Inmate Witnesses

Fowler also claims that he was denied effective assistance of counsel "when his trial counsel failed adequately to investigate and cross-examine the jailhouse informants who testified against him." (Pet. 65, ECF No. 1.) The MAR court denied this claim on the merits without an evidentiary hearing, holding that counsel effectively cross-examined each of the inmate witnesses and that Fowler was not prejudiced by counsel's decision to limit their cross-examination. [30] (Order Den. In Part MAR and AMAR 13, 16-18, 19.)

In his habeas petition, Fowler counters that:

> trial counsel could have had no strategy that would have justified failure to point out to the jury the discrepancies within a particular informant's testimony; the discrepancies between and among the testimony of various jailhouse informants; or the discrepancies between the stories offered by the informants, on the one hand, and the State's theory, on the other. No downside exists for highlighting these variations. Failure to prepare and use information that files contain or that is not difficult to ascertain—particularly when that information would have countered the bulk of the State's case—is not a strategy. Given the limited evidence against Fowler in absence of the jailhouse witnesses' testimony, it defies logic to think that any "strategy" was employed in failing to cross-examine the witnesses regarding any matter that would have required of trial counsel even a modicum of effort beyond further exploring direct examination testimony.

(Pet. 65, ECF No. 1.) Fowler does not identify any discrepancy counsel should have highlighted

---

[30] The MAR court also concluded that this claim "could have been, but was not, raised on direct appeal" and, therefore, was procedurally barred in post-conviction pursuant to N.C.G.S. § 15A-1419(a)(3)." (Order Den. In Part MAR and AMAR 12-13.) The Court need not address the procedural issue, however, because the MAR court also rejected the claim on the merits. <u>See</u> <u>Eaton</u>, 139 F.3d at 994 n.1 ("Because we agree with the district court's denial of Eaton's ineffectiveness claim on the merits, we need not resolve the thorny issue of procedural default.").

77

or any specific information that they should have prepared or used when cross-examining the inmates. Moreover, Fowler mischaracterizes counsel's efforts when he accuses them of merely exploring the inmates' direct examination testimony.

Contrary to Fowler's argument, a reasonable jurist could conclude that counsel deliberately limited their cross-examination of these inmates. In preparation for cross-examination, counsel gathered each inmate's criminal history, copies of any relevant plea agreements he had made with either the state or federal government, and any resulting plea transcripts. They also calculated the sentencing ranges each had been facing before entering into those plea agreements. Additionally, it is evident from the trial transcript that counsel had all of the inmates' pre-trial statements regarding Fowler's involvement in the Howard Johnson's crimes. Counsel did not cross-examine any of the inmates about the contents of their pre-trial statements, however, except to the extent that they included information about when they first spoke to law enforcement and why. Instead, counsel's questioning of each inmate followed the same general pattern and focused on those areas that supported their argument that the inmates' credibility was undermined by their self-interest.

Fowler is likewise mistaken that "no downside exists for highlighting these [unspecified] variations" in the inmates' testimony. (Pet. 65, ECF No. 1.) Reasonable counsel could have concluded that a broad cross-examination risked watering down their central message, which was that none of the inmates' testimony was trustworthy because each expected to benefit from testifying. Reasonable counsel could have concluded that it was more important to focus the jury on that common expectation, than on any unspecified variations in the inmates' testimony. Additionally, Waymon Fleming's statements to law enforcement consisted largely of hearsay

78

declarations made by Cullen Marshall, which were inadmissible at trial, and at least one of Leo McIntyre's statements contained details of other robberies and shootings that Fowler had committed. Moreover, both men could have testified that Fowler had either purchased or stolen a .44 Magnum revolver from Fleming prior to New Year's Eve. Reasonable counsel could have concluded that questioning the inmates about their pre-trial statements risked opening the door to more damaging evidence.[31]

### Alibi Defense

Fowler also claims that counsel were ineffective for failing to investigate and present a strong alibi defense. While acknowledging that counsel called an alibi witness, Fowler contends that there were a number of witnesses who could have provided him an alibi for all of New Year's Eve.

The MAR court held that counsel's performance in investigating and presenting an alibi defense was not deficient under Strickland. (Pet. 73, ECF No. 1.) According to Fowler,

> The [MAR] court found that trial counsel did, himself or through an investigator, contact most of the witnesses who were with Fowler on the evening of the crimes, that the potential alibi witnesses could be impeached with criminal convictions, prior inconsistent statements and use of marijuana and alcohol on that New Year's Eve, that counsel called an alibi witness, and that not calling other witnesses was a tactical decision on counsel's part. . . . The court found that in any event, Fowler could not show prejudice by counsel's not putting on the other alibi witnesses.

(Pet. 73, ECF No. 1) (citing Order Den. Remainder of MAR and AMAR 16-24, 25-26.) Fowler contends that the MAR court's rejection of his claim constituted an unreasonable application of

---

[31] Edward Adams did not make a pre-trial statement to law enforcement (Tr. 602-03), and although trial counsel received a supplemental report of a pre-trial conversation Jones had with a CMPD officer about the Howard Johnson's crimes (Tr. 378-79), post-conviction counsel did not include it as an exhibit to Fowler's MAR or AMAR.

Strickland and an unreasonable determination of the facts in light of the evidence adduced at the MAR hearing.  (Pet. 74, ECF No. 1.)

This Court is constrained to conclude that the MAR court's application of Strickland was not unreasonable.   Fowler acknowledges that either counsel or their investigator spoke to every potential alibi witness identified by Fowler prior to trial.  (Pet. 80, ECF No. 1.)  Additionally, although Fowler asserts that he has "demonstrated [that] further investigation into his alibi would have produced . . . witnesses [who] could say that they were with him during the entire time that the crime was being committed" (Pet. 81, ECF No. 1), his habeas petition does not identify a single witness who could have provided him with an alibi during the time of the Howard Johnson's crimes.  In short, he has failed to cite any evidence demonstrating that he was prejudiced by counsel's decision to call only Shenitra Johnson as an alibi witness.

Fowler has not alleged sufficient facts to support a finding by this Court that the MAR court's application of Strickland "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 131 S.Ct. at 786–87.  This claim, therefore, is denied.

Cumulative Error and Innocence Claims

Fowler contends that "[u]nder the Due Process Clause and Eighth Amendment of the United States Constitution, [he] has a right not to be convicted and sentenced to death for a crime that he did not commit."  (Pet. 88, ECF No. 1.)  He claims that "this core right was violated with the result of his trial, and the violation mandates that a writ of habeas corpus be issued on his behalf."  (Pet. 88, ECF No. 1.)  Fowler's analysis of his claim consists entirely of the following:

The reliability of verdicts is especially important in capital cases, and this cases

80

[sic] simply does not have the reliability a capital verdict deserves. Because of the cumulative errors of counsel and failures of the system, all as set forth in more detail supra, the verdict and sentence in this case violate Fowler's constitutional rights to due process of law, effective assistance of counsel and nonarbitrary capital proceedings. A writ of habeas corpus should be issued.

(Pet. 89, ECF No. 1.)  The MAR court, presented with an equally vague and conclusory set of assertions, denied the claim on the merits, essentially concluding that Fowler had failed to prove constitutional error in his case.  (Order Denying Remainder of MAR and AMAR 36.)

In Herrera v. Collins, the Supreme Court rejected a state prisoner's substantive actual innocence claim on habeas review.  506 U.S. 390 (1993).  Writing for the Court plurality, Chief Justice Rehnquist "assume[d], for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  Id. at 417.  The Chief Justice recognized, however, that "the threshold showing for such an assumed right would necessarily be extraordinarily high."  Id.  The Supreme Court has never articulated the threshold that must be met to prove actual innocence, but suffice it to say that Fowler, who has presented no evidence of actual innocence, has not met it.

In Schlup v. Delo, the Court recognized that a showing of actual innocence can serve as a "gateway" for a § 2254 petitioner to obtain a merits review of his otherwise defaulted constitutional claims.  513 U.S. 298, 315 (1995).  A gateway showing of actual innocence "must establish sufficient doubt about [the petitioner's] guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial."  Id. at 316.

Again, Fowler has not presented any evidence of actual innocence.  Nor has he sought review of his procedurally defaulted claims on the ground that evidence of his actual innocence

81

raises sufficient doubt about his guilt to excuse his procedural default.  See id.

Finally, Fowler's assertion that he is entitled to relief because of the "cumulative errors of counsel and failures of the system" must be denied.  Cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's or the trial court's individual actions.  Fisher v. Angelone, 163 F.3d 835, 852- 53 (4th Cir. 1998) (citations omitted).  The MAR court found no constitutional error in this case.  To paraphrase the court in Fisher, having determined that none of the actions taken by counsel or the trial court could be considered constitutional error, "it would be odd, to say the least, to conclude that those same actions, when considered collectively, deprived Fowler of a fair trial."  Id. at 852.

Fowler has failed to demonstrate that the MAR court's rejection of this claim resulted in a decision that was either contrary to or an unreasonable application of clearly established federal law.  It is, therefore, denied.

Sentencing Phase

Sufficiency of the Evidence:  Murder Committed For Purpose Of Avoiding Lawful Arrest

During the penalty phase of Fowler's trial, the State requested submission of the aggravating circumstance that Bobby Richmond's murder was committed for the purpose of avoiding or preventing a lawful arrest or escaping from custody.  See N.C. Gen. Stat. § 15A–2000(e)(4) (1999).  Fowler objected on the ground that it was not supported by the evidence, but his objection was overruled, and the trial court submitted it to the jury.  The jury found that the State had proven the circumstance beyond a reasonable doubt.  Fowler, 548 S.E.2d at 702. Fowler claims that submission of this aggravating circumstance violated his right to due process.

82

The sufficiency of the evidence necessary to prove the existence of an aggravating circumstance is reviewed under the same standard as that applied to prove the existence of a crime during the guilt phase of a trial.  See Roach v. Angelone, 176 F.3d 210, 218 (4th Cir. 1999) (explaining that the sufficiency of the evidence necessary to prove the existence of an aggravating circumstance is reviewed under the standard established by Jackson v. Virginia, 443 U.S. 307 (1979)) (citation omitted).  "Under the Jackson standard, a court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements ... beyond a reasonable doubt.'" Roach, 176 F.3d at 218 (quoting Jackson, 443 U.S. 307 at 319).

To submit the (e)(4) aggravating circumstance to the jury, the trial court "must find substantial, competent evidence in the record from which the jury can infer that at least one of defendant's purposes for the killing was the desire to avoid subsequent detection and apprehension for a crime."  State v. Hardy, 540 S.E.2d 334, 344 (N.C. 2000) (citations omitted). The North Carolina Supreme Court, which reviewed this claim on direct appeal, properly reviewed the evidence in the light most favorable to the prosecution.  Fowler, 548 S.E.2d at 702. In so doing, the court found that the evidence showed that Richmond was shot from behind at close range while he was lying on the floor.  Id.  The court also cited the absence of evidence that Richmond either posed a threat to Fowler or tried to resist during the robbery.  Id.  From this, the state court was entitled to infer that Richmond was shot while in a defenseless position.  The court determined that a rational juror could conclude that such a shooting was not for the purpose of merely facilitating the robbery but was to avoid being apprehended.  Id. at 702-03.

To the state court's recitation of the evidence supporting the trial court's submission of

83

the (e)(4) circumstance, this Court adds that Fowler shot both Richmond and Shah after Shah had handed Fowler's partner the money from the motel register. Fowler, 548 S.E.2d at 690. Looking at all of the evidence in the light most favorable to the prosecution, a rational juror could conclude that Fowler wanted to eliminate both witnesses to the robbery.

It was reasonable for the North Carolina Supreme Court to conclude that there was sufficient evidence from which a rational trier of fact could find "beyond a reasonable doubt . . . every fact necessary to constitute" the aggravating circumstance that Fowler killed Richmond for the purpose of avoiding or preventing a lawful arrest. In re Winship, 397 U.S. at 364. Consequently, the state court's rejection of this claim did not result in a decision that was either contrary to, or an unreasonable application of, clearly established Federal law.

Mitigating Evidence Instruction

Fowler claims that the trial court's instruction on mitigating circumstances was constitutionally defective because it failed to inform jurors that they could consider any aspect of his character or record that could serve as a foundation for a sentence less than death. (Pet. 110, ECF No. 1.) Instead, Fowler contends, the instruction misled the jurors into believing that they could only consider those circumstances that reduced the moral culpability of the killing as mitigating. (Pet. 110, ECF No. 1.)

Fowler raised this issue on direct appeal as a preservation issue, acknowledging that the North Carolina Supreme Court previously had decided the issue contrary to his position. Fowler, 548 S.E.2d at 703. The court held that Fowler had not presented any compelling reason for the court to depart from its prior holdings and that the claim was without merit. Id.

In a capital case, a jury or court imposing sentence may "not be precluded from

84

considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis and footnotes omitted).  The jury or court imposing sentence "may determine the weight to be given relevant mitigating evidence[,] . . . [b]ut [it] may not give [the evidence] no weight by excluding [it] from . . . consideration." Eddings v. Oklahoma, 455 U.S. 104, 114 (1982).  "The 'central requirement' of Lockett and its ensuing line of cases is that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all.'" Jones v. Polk, 401 F.3d 257, 263 (4th Cir. 2005) (quoting Johnson v. Texas, 509 U.S. 350, 362 (1993) (internal quotation marks and citation omitted)).

When a petitioner argues that an instruction prevented a jury from considering mitigating evidence, the court must determine "whether there is a reasonable likelihood the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  Boyde v. California, 494 U.S. 370, 380 (1990).  The alleged error in the instruction must be reviewed in the context of the overall charge.  Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

The trial court gave the following instruction defining mitigating circumstances:

And I instruct you that of these twelve specific mitigating circumstances that are listed on the form, you should consider each of them before answering Number Two, and I instruct you in this regard that a mitigating circumstance is a fact or a group of facts which do not constitute a justification or an excuse for a killing, nor do they reduce it to a lesser degree of crime than first degree murder.

But they are such as may be considered by you as extenuating, or reducing the

85

> moral culpability of the killing or making it less deserving of the extreme punishment of the death penalty that is less so than other first degree murders.
>
> Now, our law specifies several possible mitigating circumstances, however, in considering this issue number Two, it is your duty to consider, as a mitigating circumstance, any aspect of the Defendant's character, and any of the circumstances of this murder that the Defendant contends is a basis for a sentence less than death as well as any other circumstances arising from the evidence which you deem to have mitigating value.

(Tr. 1498-99.). Fowler's assertions notwithstanding, the trial court clearly instructed the jurors that they had a duty to consider any aspect of Fowler's character, any aspect of the crime, and any circumstance arising from the evidence that they thought had mitigating value in arriving at a sentence.

Juries are presumed to follow the law and instructions given. See Weeks v. Angelone, 528 U.S. 225, 234 (2000); McHone v. Polk, 392 F.3d 691, 708 (4th Cir. 2004). In Fowler's case, the record bears direct evidence that his jury did so. In addition to considering a statutory mitigating circumstance, Fowler's age at the time of the crime, see N.C. Gen. Stat. § 15A-2000(f)(7), his jury considered twelve non-statutory mitigating circumstances. All of the non-statutory mitigating circumstances found by the jury were related to Fowler's upbringing.[32]

Considering the jury instructions as a whole, the North Carolina Supreme Court reasonably concluded that there was not a reasonable likelihood that the instruction led the jury to believe that they could, or had to, disregard "constitutionally relevant evidence." See Boyde, 494 U.S. 370, 380 (1990). Therefore, the state court's rejection of this claim did not result in a

---

[32] These were that Fowler had no stable father figure, an unstable home environment, and a mother who abused alcohol. Fowler, 548 S.E.2d at 703. Significantly, the last of the three was not offered by the defense but was found to have mitigating value under the statutory "catch-all" mitigating circumstance that allows the jury to consider any evidence presented at trial that it deemed to have mitigating value. See N.C. Gen. Stat. § 15A-2000(f)(9).

86

decision that was either contrary to or an unreasonable application of <u>Lockett</u>, <u>Eddings</u>, <u>et al</u>.

Proportionality Review Claim

North Carolina law requires the North Carolina Supreme Court to conduct an automatic review of every capital conviction and death sentence challenged on appeal. <u>See</u> N.C. Gen. Stat. § 15A-2000(d). The court is required to determine "(1) whether the record supports the jury's finding of any aggravating circumstances upon which the death sentence was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." <u>Fowler</u>, 548 S.E.2d at 703 (citing § 15A–2000(d)(2)).

On direct appeal, Fowler challenged the constitutionality of North Carolina's proportionality review standards. (Def.-Appellant's Br. 111-17.) Specifically, he asserted that the standards used by the court to determine whether the death sentence in a particular case was disproportionate or excessive are vague and arbitrary, thereby depriving defendants, including Fowler, of their rights to notice, effective assistance of counsel, due process, and to be free from cruel and unusual punishment. Fowler raised this as a preservation issue, and the appellate court found that he had not presented any compelling reason for the court to depart from its prior holdings. <u>Fowler</u>, 548 S.E.2d at 703. Accordingly, the court held that the claim was without merit. <u>Id.</u>

Here, Fowler ostensibly raises the same claim. (Pet. 113-21, ECF No. 1.) However, he makes arguments related only to due process and Eighth Amendment rights. (Pet. 113-21, ECF No. 1.) Because he advances no argument related to his Sixth Amendment right to the effective

87

assistance of counsel, the Court finds that claim is abandoned.

"It is a well-settled proposition that the individual States are not constitutionally required to provide defendants who have been convicted of capital crimes with 'proportionality reviews' of their death sentences." Roach v. Angelone, 176 F.3d 210, 216 (4th Cir. 1999) (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984); see also Middleton v. Roper, 498 F.3d 812, 821-22 (8th Cir. 2007); Riley v. Taylor, 277 F.3d 261, 310 (3rd Cir. 2001); Buell v. Mitchell, 274 F.3d 337, 368 (6th Cir. 2001). Nevertheless, Fowler argues that when a state adopts such a procedure by statute, it creates a liberty interest, requiring the courts to apply the procedure in accordance with the requirements of the Due Process Clause. (Pet. 113, ECF No. 1.) Fowler appears to contend that the North Carolina Supreme Court operates without any clear guidelines when choosing the pool of cases against which it compares a defendant's to determine whether that defendant's death sentence is disproportionate. Additionally, Fowler appears to contend that the Due Process Clause requires the North Carolina court to consider all of the mitigating circumstances favoring a life sentence when conducting its proportionality review.

Under federal habeas law, a federal court is limited to deciding whether a conviction, or sentence, violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) (citing 28 U.S.C. § 2241). The proportionality review conducted by the state supreme court was mandated by a North Carolina statute, not the federal constitution, and Fowler has not cited any case holding that proportionality review is the type of state-created right whose application is subject to the dictates of the federal due process clause. This Court does not have the power to reexamine a state court's determination of state law, absent some evidence that the court undertook its proportionality review in something other than "good faith."

88

See Roach, 176 F.3d at 217 (citing Walton v. Arizona, 497 U.S. 639, 656 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584 (2002) ("[T]he Arizona Supreme Court plainly undertook its proportionality review in good faith and found that Walton's sentence was proportional to the sentences imposed in cases similar to his. The Constitution does not require us to look behind that conclusion.)). There being no evidence that the North Carolina Supreme Court undertook its proportionality review in anything other than good faith, this claim must fail.

Fowler also claims that his "sentence of death was based on arbitrary factors and disproportionate" and that a life sentence should have been imposed. (Pet. 121, ECF No. 1.) He contends that the North Carolina Supreme Court's finding that there was no evidence that his death sentence was "imposed under the influence of passion, prejudice or any other factor" (Pet. 121, ECF No. 1) (quoting Fowler, 548 S.E.2d at 703), was contrary to and an unreasonable application of clearly established federal law and constituted an unreasonable adjudication of the facts in light of the evidence adduced at trial. (Pet. 121-22, ECF No. 1.)

Findings of fact by the state court are presumed to be correct on federal habeas review. § 2254(e)(1). Fowler bears the burden of rebutting that presumption of correctness by clear and convincing evidence. Id. Here, Fowler has cited no facts or applicable case law to support his conclusory assertions that his death sentence was based upon arbitrary factors. Consequently, he has failed to rebut the presumption of correctness accorded the state court's finding, see id., and cannot show that the court's rejection of his claim resulted in a decision that was contrary to or an unreasonable application of clearly established federal law or that it constituted an unreasonable adjudication of the facts in light of the evidence adduced at trial.

Likewise, Fowler has cited no facts or applicable case law to support his conclusory

89

assertion that his death sentence was disproportionate. Nor has he put forth any argument on this issue. Nevertheless, his assertion is premised upon the Eighth Amendment and the notion that to apply the death penalty in his case would be so disproportionate as to constitute cruel and unusual punishment.

In Pulley v. Harris, the Supreme Court recognized two proportionality-related Eighth Amendment issues. The first is whether the death penalty is inherently proportionate "to the [statutory] crime for which it was imposed." Harris, 465 U.S. at 43. The Supreme Court has "occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." Id.; see e.g., Coker v. Georgia, 433 U.S. 584 (1977) (holding that a death sentence for the crime of rape of an adult woman was grossly disproportionate and excessive punishment under the Eighth Amendment). The second type assumes that "the death sentence is not disproportionate to the crime in the traditional sense," but "purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." Harris, 465 U.S. at 43.

Fowler does not suggest that the death penalty is disproportionate for the offense of premeditated and deliberate first-degree murder during the course of an armed robbery. Instead, his arguments, such as they are, suggest that his death sentence is disproportionate when the circumstances of his case are compared to those in other capital cases. This claim is barred, however, by the holdings in Harris and Walton. See Harris, 465 U.S. at 43-44 (holding that there is no Eighth Amendment right to proportionality review); Walton, 497 U.S. at 65-66 ("[P]roportionality review is not constitutionally required, and we lawfully may presume that

90

[Walton's] death sentence was not 'wantonly and freakishly' imposed-and thus that the sentence is not disproportionate within any recognized meaning of the Eighth Amendment.") (citation omitted). This claim is denied.

## Ineffective Assistance of Counsel

At sentencing, Fowler's counsel called five mitigation witnesses. Keisha Culbreath,[33] the mother of Fowler's two children, ages four and one, testified that when they met, Fowler was attending school and working at a Bojangles restaurant. (Tr. 1350, 1352-53.) She and Fowler began living together after their son was born. (Tr. 1354.) Fowler watched their son, Darnell, during the day while Keisha worked, and then Fowler would work at night. (Tr. 1354-55.) She also testified that Darnell missed his father and talked about him every day; that their daughter was born while Fowler was incarcerated for the Howard Johnson's crimes, and that she and Fowler had planned to get married. (Tr. 1355-56.)

Fowler's great aunt, Dorthea Ashford, a retired school teacher, testified about the home life Fowler had with his mother, Deborah Fowler. (Tr. 1365-66.) Ashford testified that Deborah Fowler abused alcohol and that Youth and Family Services removed Fowler from Deborah's home when he was a teenager. (Tr. 1367.) Ashford arranged with Youth and Family Services for Fowler to live with her. (Tr. 1367.) Although Ashford denied that Deborah abused Fowler, she stated a belief that Deborah's alcoholism resulted in Fowler being mistreated, and that Deborah "[didn't] want to admit it." (Tr. 1366-67.) Ashford testified that Fowler lived with her

---

[33] The court reporter listed this witness as "Keisha Colebrook" in the trial transcript. (Tr. 1350.) Because she is referred to as Keisha Culbreath in the state and federal pleadings, this Court will likewise refer to the witness as Keisha Culbreath.

for five to six years and during that time, he went to high school, worked after school and on weekends, went to church, and played basketball on the church team.  (Tr. 1368-69.)  Fowler bought his own clothes, and although Ashford did not ask him to, Fowler would sometimes give her money for gas and other expenses.  (Tr. 1369.)  Ashford also testified that Fowler had very little relationship with his father growing up, but that after Fowler began living with her, he would stay at his father's house on some weekends.  (Tr. 1369-70.)  She told the jury that Fowler's hobby was building model airplanes, that in high school he was interested in going into the Air Force, and that he won a second place Optimist Award.  (Tr. 1370-71.)

Earl Bratton testified that he met Fowler through a mutual acquaintance, and that he and Fowler discovered they had a common interest in music.  (Tr. 1374.)  Bratton also testified that Fowler lived with him for a short period of time when Fowler was 17.  (Tr. 1374.)  During that time, Fowler worked, helped with household expenses and chores, and followed Bratton's rules fairly well.  (Tr. 1374-75.)  During that time, Fowler also became interested in becoming a Muslim and attended services at the temple.  (Tr. 1375-76.)

Sergeant James McGuire of the Mecklenburg County Sheriff's Office testified that he was working off-duty as a security guard at a Bojangles restaurant in the Spring of 1995, when Fowler started working there as a biscuit-maker.  (Tr. 1378.)  Sergeant McGuire testified that his impression of Fowler was that he was a good, reliable employee.  (Tr. 1378-79.)

Fowler's mother, Deborah, testified that until Fowler was a teenager, he had no relationship with his father.  (Tr. 1380-81.)  Fowler and his brother would sometimes see their father "out on the streets," but their father never spent any time with them.  (Tr. 1381.)  She testified that Fowler was an "A" student until she moved them into the projects in Fairview

92

Homes, and his grades began to drop. (Tr. 1381). She also testified that Fowler always had a job and that he gave her money whenever she asked. (Trial. Tr. 1382.) She testified that she did not ask often because she wanted her sons to work for themselves. (Tr. 1382.)

Based on the evidence presented at sentencing, the trial court submitted thirteen mitigating circumstances to the jury. The jury found the existence of four: (1) that Fowler was twenty years old at the time of the homicide; (2) that Fowler had no stable father figure in his life; (3) that Fowler had an unstable home environment; and (4) under the catch-all circumstance, that Fowler had a mother who abused alcohol. (R. at 185-87.)

In his MAR, Fowler asserted that trial counsel performed deficiently by failing to investigate, develop, and present additional mitigation evidence regarding parental neglect and abuse of Fowler. Additionally, Fowler claimed that counsel were ineffective for failing to present evidence of his participation in the state's "Willie M." program, which, he argued would have provided powerful mitigation evidence of the effect parental abuse and neglect had on Fowler's mental functioning. (MAR 81-104.) Fowler raises the same claims in the instant petition. (Pet. 89-106, ECF No. 1.) The MAR court held an evidentiary hearing on this claim, which it reopened twice.

At the hearing, Fowler presented the testimony of two aunts, Vernell Foster and Dorothea Ashford; his maternal grandmother, Nancy Murray; and his step-mother, Mary Jane Roseboro. Through their testimony Fowler presented evidence tending to show that his mother was sixteen when she became pregnant with him; that his mother was an alcoholic throughout his childhood and adolescence; that Deborah's mother was a heavy drinker when Deborah was growing up; that Deborah had two siblings who were alcoholics; that Fowler often saw his mother drunk; and

93

that his mother frequently neglected Fowler and his brother, forcing them to take care of themselves or to rely on family members for assistance. (MAR Evidentiary Hr'g Tr. 8, 11, 12-13, 14-15, 67, 588-93.) The witnesses who were asked denied seeing Deborah physically abuse Fowler, although Murray testified that she had seen Deborah hit Fowler with her fist. (MAR Hr'g 17, 32, 64, 78, 592.) The witnesses' testimony also tended to show that Fowler's father was absent from his life until Fowler was in his mid-teens, and that the absence was due, in part, to the father's alcohol and drug abuse. (MAR Hr'g 9-10, 76, 615-19.)

Fowler also presented the testimony of Dr. Merle Walker, who was the clinical director of Mecklenburg County's Willie M. Program when Fowler was admitted into the program. Dr. Walker explained that the Willie M. program was a treatment program for children and adolescents who had demonstrated that they were in danger, had been violent toward themselves or others, had a diagnosable mental illness, and had been denied treatment by other providers because of their behavior. (MAR Hr'g 667, 670.) In Mecklenburg County's program, "only ninety [children] a year were violent enough" to be treated in the program. (MAR Hr'g 667, 699.) Dr. Walker testified that Fowler was recommended for admission to the Willie M. program by a juvenile court psychologist. (MAR Hr'g 665.)

Dr. Walker was asked a number of specific questions at the hearing about the contents of the Willie M. records that post-conviction counsel argue should have been introduced in mitigation. He and others testified that the Willie M. records contained Fowler's records from other treatment facilities and social services organizations that had been involved with Fowler and his family. Among those records were those from Fowler's inpatient treatment at Mecklenburg Mental Health Hospital that showed he had been admitted at age 12 for "immediate

94

hospitalization for homicidal ideation." (MAR Hr'g 627-28, 680, 699.) Dr. Walker testified that Fowler's mental health records indicated that his violence and threats of violence toward his family revolved around his relationship with his mother. (MAR Hr'g 681.) He also testified that the records reported that Fowler's mother had been violent toward him when he was younger. (MAR Hr'g 681.) A psychological evaluation in the records stated that Fowler was very immature, had unusual beliefs and fantasies, and had concerns about his own anger and his willingness to use that anger to act out in an aggressive way. (MAR HR'g 685, 689.) Dr. Walker testified that Fowler had been diagnosed as having a "conduct disorder, socialized aggressive type, moderate." (MAR HR'g 685.) Dr. Walker stated that "extreme or harsh punishment, harsh discipline, punishment, [are] things that tend[ ] to be associated with development of a conduct disorder." (MAR HR'g 687.) Dr. Walker also testified that a child who has been abused "tends to have a lot of feelings both of fear and anger that are kicked off anytime he gets in a stressful situation. So he starts responding emotionally, pretty extreme emotional responses, and that makes it much more harder for the child to control his behavior." (MAR HR'g 688.)

Dr. Walker also testified that Fowler seemed to recognize that some of his actions were inappropriate but most of the time rationalized them as being a just response to his mother's mistreatment of him. (MAR Hr'g 681.) Dr. Walker testified that Fowler reacted negatively to the prospect of returning home, that he had nightmares about returning home, and that he did everything he could think of to convince the staff not to send him home. (MAR HR'g 682.) According to Dr. Walker, the Willie M. records also indicated that Fowler was relatively intelligent, had hobbies that occupied his time in constructive ways, was generally cooperative

almost all the way through the program, was willing to accept suggestions, and appeared to recognize that his anger and tendency to get out of control were problems that could get him in trouble. (MAR Hr'g 689-90.) Dr. Walker testified that Fowler did well in the program for an extended period of time, responded well to structured environments, and acted out much less than other kids in the program. (MAR HR'g 690-92.)

Fowler also presented evidence at the hearing through his trial attorneys, Kevin Barnett and Harold Bender. Barnett testified that Fowler himself was the source of a lot of family and background information, but Barnett also talked to members of Fowler's family. (MAR Hr'g 363; 394.)[34] During the course of their investigation, counsel learned that Fowler had a very unstable upbringing, that his mother was an alcoholic, that his father was absent for most of Fowler's life, and that there was a lack of parental control in the home when he was growing up. (MAR Hr'g 402-406). Specifically, counsel learned that Fowler's mother's alcohol abuse was the primary source of the instability.[35]

Counsel also learned that Fowler had been admitted into the Willie M. program as a teenager. Shortly after his appointment, Barnett made requests for mental health records and

---

[34] Evidence was presented at the hearing that trial counsel gave all of their files to Fowler's first post-conviction counsel, who subsequently was removed by the MAR court and replaced by the attorneys who represented Fowler at the hearing. It was established at the hearing that Fowler's first post-conviction counsel failed to transfer all of trial counsel's files to Fowler's second set of attorneys. (MAR Hr'g 303, 304-305, 367-371.) Among the files that were not recovered were most of Kevin Barnett's witness files, which contained information regarding who he interviewed in preparation for trial and sentencing and what they said. (MAR Hr'g 367-371, 381, 483-84.) Bender also testified that most of his notes were missing. (MAR Hr'g 555-56.) Consequently, both attorneys testified largely from memory about their actions prior to a trial that had taken place nine years previously.

[35] Fowler makes much of the fact that counsel did not hire a private investigator until October, 1997, a few weeks before trial, and that the investigator, Jan Barefoot, spent only two hours on the penalty phase investigation. (Pet. 90-91, ECF 1.) Barefoot testified, however, they she was not hired to conduct a mitigation investigation but only to interview a few witnesses. (MAR Hr'g 296, 308, 340.) Kevin Barnett testified that he interviewed witnesses and conducted most of the background investigation himself. (MAR Hr'g 367.) Bender also indicated that he interviewed witnesses. (MAR Hr'g 537.)

psychiatric records, including those from the Willie M. program. (MAR Hr'g 393-94, 488-89, 507.) Barnett also arranged for an early psychiatric screening for competency and a forensic examination for Fowler at Dorothea Dix Hospital. (MAR Hr'g 363-64, 481.) Additionally, counsel obtained funds from the trial court to retain a private mental health expert to conduct a forensic evaluation of Fowler and to advise counsel regarding possible mental health mitigating evidence. (MAR Hr'g 363-64, 507-08.) Counsel obtained additional school and mental health records at their expert's request. (MAR Hr'g 395-97, 427.) Both Barnett and Bender testified that they read all of the mental health records that they obtained. (MAR Hr'g 429-30, 431, 541.)

The Willie M. files chronicled an extensive history of violence by Fowler, including burning his brother with nails heated on the stove, repeatedly threatening to kill his mother and brother; and assaulting other children at school resulting in physical injury to those children. (MAR Hr'g 490-92). The records also reflected incidents of Fowler setting fires in his home, two emergency psychiatric commitments, and numerous examples of Fowler's inability to control his anger. (MAR Hr'g. 492, 557-59, 612, 627-28, 699). The records included information that Fowler would hit and kick his mother until restrained by others, and that on one occasion, the police were called to intervene when he threatened his family with steak knives. (MAR Evidentiary Hr'g Ex. 41, at 20.)

Trial counsel retained the services of Dr. Steven Bondy, a forensic psychologist, who reviewed the Willie M. records, records from Fowler's psychiatric commitments, and other documents. (MAR Hr'g 500, 503.) Dr. Bondy helped counsel interpret the records and evaluated Fowler. (MAR Hr'g 501.) Dr. Bondy advised counsel that the mental health records indicated that Folwer possessed uncontrollable violence and anger. (MAR Hr'g 503.) Barnett

97

testified that Dr. Bondy described Fowler as "evil." (MAR Hr'g 503.) Bender also recalled Dr. Bondy's use of the word "evil." (Re-opened MAR Hr'g Tr. 31, April 26, 2007.)[36] Based on their own review of the records and their discussions with Dr. Bondy, trial counsel decided not to introduce evidence of Fowler's participation in the Willie M. Program. (MAR Hr'g 394, 501, 504).

The MAR court determined that trial counsel used reasonable judgment and were thorough, diligent, and effective in their investigation of, and presentation of, mitigation evidence at trial. (Order Den. Remainder of MAR and AMAR 40.) The court found that counsel did approximately twenty-one and a half weeks of trial preparation, which included requesting mental health records as early as three months after the murder, having Fowler screened for competency, evaluated at Dorothea Dix hospital, and evaluated by a psychologist retained by the defense. (Order Den. Remainder of MAR and AMAR 46-47; MAR Hr'g. 363-64,400-401, 480-81, 492, 507-8.) The court concluded that the additional evidence in the MAR of Fowler's unstable upbringing and his mother's alcoholism was largely cumulative of the evidence presented at Fowler's sentencing trial. The MAR court also found that trial counsel made a tactical decision not to introduce evidence of Fowler's participation in the Willie M. Program because they believed the negatives of doing so far outweighed the positives. (Order Den.

_____

[36] Dr. Bondy testified at the re-opened evidentiary hearing on April 20 and 26, 2007. He testified that he was hired to conduct a forensic evaluation of Fowler (Re-opened MAR Hr'g Tr. 103), and that he reviewed a number of Fowler's records, including the Willie M. records (Re-opened MAR Hr'g 109-11). He acknowledged having discussed the Willie M. records with counsel. (Re-opened MAR Hr'g 123-24.) He denied having completed a report for counsel, noting that he never completed the evaluation. (Re-opened MAR Hr'g 109, 111-12.) Dr. Bondy testified that he did not recall having had a meeting with counsel at which he shared the results of a test suggesting Fowler had characteristics of three personality disorders, including anti-social personality disorder and narcissistic personality disorder. (Re-opened MAR Hr'g 129-30.) He could not definitively state that such a meeting had not occurred, however. (Re-opened MAR Hr'g 130.) He also denied having made a formal diagnosis, or that he told counsel that he had concluded that Fowler was "evil." (Re-opened MAR Hr'g 111-14).

98

Remainder of MAR and AMAR 47.)  Consequently, the MAR court held that Fowler had failed to show that counsel performed deficiently with respect to the sentencing phase.  (Order Den. Remainder of MAR and AMAR 47.)  The court also held that Fowler had failed to demonstrate prejudice.  (Order Den. Remainder of MAR and AMAR 48.)

The court's findings were supported by the record.  Fowler's counsel faced a difficult challenge at sentencing.  On the one hand, Fowler had been convicted of premeditated and deliberate first-degree murder in a case with no forensic evidence connecting him to the murder, a questionable eyewitness identification, and testimony by four self-interested felons, which left open the possibility of residual doubt sentiment at sentencing.  (MAR Hr'g 628.)  Counsel also knew through pre-trial discovery and their own investigation that Fowler was implicated in other armed robberies, and had shot a man at a Waffle House restaurant about six weeks before the Howard Johnson's crimes.  (MAR Hr'g 344-45; MAR Ex. 57, at 2; MAR Ex. 62, at 1; MAR Ex. 63, at 2.)  Trial counsel knew that while that evidence would be largely inadmissible at trial unless Fowler chose to testify, the State would be able to introduce some, if not all of it, at sentencing, depending upon the type of mitigation defense Fowler presented.  (Tr. 1248-55.)  One of counsel's goals at sentencing was to keep the jury from hearing evidence of Fowler's prior bad acts, a not uncommon goal for defense attorneys.  (Tr. 1385-95.)  Consequently, counsel had to be circumspect about the type of mitigation defense they presented.

Counsel chose to present evidence of Fowler's unstable home life, alcoholic mother, relative success while living with his great aunt, and his history of working to support himself and his family.  That counsel could have presented more detail regarding Fowler's unstable home life, alcoholic mother, and absent father does not render their performance deficient.  The

99

jury clearly understood the import of the evidence; it found three circumstances regarding his unstable upbringing to be mitigating.

Moreover, there is no question that counsel made a tactical decision not to introduce mental health evidence at sentencing. To argue otherwise simply ignores the evidence presented at the MAR hearing. Fowler's own evidence showed that both Bender and Barnett had read Fowler's mental health records, including the Willie M. records, and discussed them with Dr. Bondy. Bender and Barnett were of the opinion that the records presented a treasure trove of rebuttal and aggravation evidence for the State, which would have been entitled to copies of the records had defense witnesses testified about Fowler's participation in the program. (MAR Hr'g 488-92, 557-60, 621.) Trial counsel believed that the history of violence documented in Fowler's mental health records would not be viewed by jurors as mitigating Fowler's responsibility for the murder of Bobby Richmond. (MAR Hr'g 492, 559-60, 566, 621.) On cross-examination, Bender also stated his belief that if the jury had heard about Fowler's history of violence, beginning at age 12, any residual doubt a juror might have had about Fowler's involvement in the Howard Johnson's murder "would've gone out the window." (MAR Hr'g 628.) Reasonable counsel also could have concluded that Fowler's age at the time of the murder would not be viewed as a mitigating circumstance if the jury knew of Fowler's violent history.

Fowler argues that trial counsel could not have made a reasonable decision to forgo testimony regarding his participation in the Willie M. program because counsel did not interview any of the people involved in the program. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Trial counsel testified that they read all of Fowler's

100

mental health records, consulted a mental health expert, who also read Fowler's mental health records, and decided that the risks of presenting evidence of Fowler's mental health history far outweighed any potentially mitigating value.  (MAR Hr'g 492, 559-60, 566, 621-25.)  Having made that decision, reasonable counsel could have concluded that interviewing mental health professionals who had administered the Willie M.. program or who had participated in Fowler's treatment would have been a waste of time and resources.  See Strickland, 466 U.S. at 691.

Additionally, the fact that post-conviction counsel would have pursued a different mitigation strategy is irrelevant to whether trial counsel adopted a reasonable sentencing strategy.  Post-conviction counsel appears to be operating under the misconception that trial counsel could have introduced positive evidence of Fowler's participation in the Willie M. program without any negative repercussions.  (MAR Hr'g 492-97.)  At the first mention of the Willie M. program, however, the State would have been granted access to those records.  (MAR Hr'g 501.)  The State then would have cross-examined those witnesses about every act of violence that appeared in the records.  (MAR Hr'g 490-91.)  Counsel worked very hard to keep evidence of Fowler's criminal record and violent history away from the jury, so that it would not have a reason to view Fowler's actions on New Year's Eve as other than an isolated event. Reasonable counsel could have determined that introducing the Willie M. evidence would lead the jury to conclude that Fowler's actions on New Year's Eve were merely the last in a long history of violent acts.

Moreover, had the State obtained access to the Willie M. records, prosecutors would have learned that the Department of Social Services had not removed Fowler from his mother's home because of her alcoholism but because of his violent behavior toward her and his brother.  (MAR

101

Hr'g Ex. 41, at 19-21.)  That would have allowed the State to undermine the impression left by Ashford that Fowler was sent to live with her because of his mother's alcohol-induced abuse and neglect.  It was Dorothea Ashford's testimony that provided the basis for two of the four mitigating circumstances found by the jury.

In sum, Fowler has not demonstrated that there was no reasonable basis for the MAR court's conclusion that trial counsel performed adequately with respect to the penalty phase of trial.  See Richter, 131 S.Ct. at 784.  Because the MAR court's decision on the performance prong was not "so lacking in justification that [it] was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," id. at 786-87, this Court need not address the MAR court's conclusion that Fowler also failed to prove prejudice under Strickland.  See Gardner v. Ozmint, 511 F.3d 420, 429 n.3 (4th Cir. 2007) (citing United States v. Roane, 378 F.3d 382, 409 n.15 (4th Cir. 2004); Williams v. Kelly, 816 F.2d 939, 946-47 (4th Cir. 1987)).

CONCLUSION

**IT IS, THEREFORE, ORDERED** that Fowler's Petition for Writ of Habeas Corpus (ECF No. 1) is **DENIED AND DISMISSED**, and Respondent's Motion for Summary Judgment (ECF No. 14) is **GRANTED**.

**IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, this Court declines to issue a certificate of appealability as Fowler has not made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (stating that in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of

102

the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 474, 484 (2000)

(holding that when relief is denied on procedural grounds, a petitioner must establish both that

the correctness of the dispositive procedural ruling is debatable and that the petition states a

debatably valid claim of the denial of a constitutional right).

**IT IS SO ORDERED.**

Signed: March 26, 2013

Frank D. Whitney
United States District Judge

103